

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-1997

# In Re: Tutu Wells

Precedential or Non-Precedential:

Docket 96-7385,96-7392

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"In Re: Tutu Wells" (1997). *1997 Decisions*. Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 22, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-7385, 96-7386, 96-7387, 96-7388
96-7389, 96-7390, 96-7391, 96-7392

IN RE: TUTU WELLS CONTAMINATION LITIGATION

ESSO STANDARD OIL S.A. LTD.; ESSO VIRGIN ISLANDS,
INC.; ESSO STANDARD OIL CO., (PUERTO RICO)
APPELLANTS IN NO. 96-7385

GOLDMAN, ANTONETTI & CORDOVA; FRANCIS TORRES,
ESQUIRE; JOSE CEPEDA, ESQUIRE
APPELLANTS IN NO. 96-7386

EUGENIO C. ROMERO, AN ATTORNEY AT LAW,
APPELLANT IN NO. 96-7387

L'HENRI, INC.,
APPELLANT IN NO. 96-7388

RHODA HARTHMAN; CHARLOTTE A. LABARRE;
ALBERT E. HARTHMAN; ARTHUR E. HARTHMAN;
AUSTIN E. HARTHMAN; EDGAR A. HARTHMAN;
SAMMY E. HARTHMAN; P.I.D., INC.;
TUTU SERVICES, LIMITED,
APPELLANTS IN NO. 96-7389

RAMSAY MOTORS, INC.,
APPELLANT IN NO. 96-7390

TEXACO INC.; TEXACO CARIBBEAN, INC.;
VERNON MORGAN,
APPELLANTS IN NO. 96-7391

FOUR WINDS PLAZA PARTNERSHIP,
APPELLANTS IN NO. 96-7392

On Appeal From the United States District Court
of the Virgin Islands
Division of St. Thomas
(D.C. Civ. No. 89-cv-00107)

Argued: March 11, 1997

Before: BECKER, SCIRICA, and ALITO, <u>Circuit Judges</u>.

(Filed July 22, 1997)

KELL M. DAMSGAARD, ESQUIRE
  (ARGUED)
TERRI JACOBSEN, ESQUIRE
Morgan, Lewis & Bockius LLP
2000 One Logan Square
Philadelphia, PA 19103-6996

DOUGLAS L. CAPDEVILLE,
 ESQUIRE
2107 Company Street
Lot No. 4
Christiansted, St. Croix, VI 00820

<u>Attorneys for Appellants</u>
<u>Esso Standard Oil S.A. Ltd.,</u>
<u>Esso Virgin Islands, Inc.,</u>
<u>Esso Standard Oil Co. (Puerto Rico)</u>

2

DANIEL RIESEL, ESQUIRE
Sive, Paget & Riesel, P.C.
460 Park Avenue
New York, New York 10022

VINCENT J. APRUZZESE,
 ESQUIRE (ARGUED)
Apruzzese, McDermott, Mastro &
 Murphy
Somerset Hills Corporate Center
25 Independence Blvd.
Liberty Corner, New Jersey 07938

EDWARD H. JACOBS, ESQUIRE
Jacobs & Brady
7 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820

Attorneys for Appellants Goldman,
Antonetti & Cordova, Francis Torres,
Esquire, and Jose A. Cepeda,
 Esquire

JOEL H. HOLT, ESQUIRE (ARGUED)
Holt & Russell
2132 Company Street, Suite 2
Christiansted, St. Croix
U.S. Virgin Islands 00820

Attorney for Appellant
Eugenio C. Romero

3

NANCY D'ANNA, ESQUIRE
  (ARGUED)
Law Office of Nancy D'Anna
P.O. Box 8330
St. John, U.S. Virgin Islands 00831

Attorney for Appellants L'Henri, Inc.,
Rhoda J. Harthman, Charlotte A.
Lebarre, Albert E. Harthman,
Austin E. Harthman, Edgar A.
Harthman, Sammy E. Harthman PID,
Inc., Water Services, Limited and
Tutu Park, Limited

CAROL ANN RICH, ESQUIRE
  (ARGUED)
Campbell, Areliano & Rich
4A&B Kongens Gade
P.O. Box 11899
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00820

Attorney for Appellant
Ramsay Motors, Inc.

JOHN K. DEMA, ESQUIRE
  (ARGUED)
CAREY-ANNE MOODY, ESQUIRE
Law Offices of John K. Deman, P.C.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5008

Attorneys for Four Winds Plaza
Partnership

4

ADDISON J. MEYERS, ESQUIRE
  (ARGUED)
O'Connor & Meyers, P.A.
2801 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134

Attorneys for Appellants Texaco Inc.
and Texaco Caribbean Inc.

JOHN ZEBEDEE, ESQUIRE
Hymes & Zebedee, P.A.
P.O. Box 990
Emancipation Garden Station
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00804-0990

Attorneys for Vernon Morgan

JOHN R. COON, ESQUIRE
  (ARGUED)
Wright, Coon & Cunningham, P.A.
377 Fore Street
P.O. Box 7526
Portland, Maine 04112-7526

Attorneys for Appellee
Western Auto Supply Co.

JULIO A. BRADY, ESQUIRE
Attorney General
Government of the Virgin Islands
Department of Justice
6040 Castle Coakley
Christiansted, St. Croix
U.S. Virgin Islands 00820

Attorneys for Amicus Curiae

5

**OPINION OF THE COURT**

BECKER, Circuit Judge.

This is an appeal from an order of the district court imposing heavy sanctions upon a law firm, several of its partners, and its client for discovery violations in connection with a large environmental lawsuit. The client, Esso, is charged in the underlying complaint with having poisoned "the wells" in the Estate Tutu area in the eastern end of St. Thomas by releasing from the Esso Tutu service station petroleum hydrocarbons and chlorinated hydrocarbons into the Tutu aquifer which supplies drinking water to much of the east end of the island. The discovery abuse primarily involves the alleged suppression by Esso's former counsel in the litigation, the San Juan, Puerto Rico law firm of Goldman, Antonetti, Ferraiuoli & Axtmayer, of a report by Jose Agrelot, a professional engineer, summarizing the results of soil and liquid tests he had performed at the Esso Tutu site in December 1989. The suppression of this report is claimed to have dramatically increased the discovery time and expense for other parties in connection with their prosecution of the case. There are also other alleged, though less aggravated, instances of obdurate discovery-related behavior.

What specially marks this case is the character and magnitude of the sanctions imposed. Eschewing the auspices of Fed. R. Civ. P. 37, which authorizes sanctions for failure to make disclosure or cooperate in discovery, the district court imposed the challenged sanctions under its inherent power. The sanction imposed on the lawyers was suspension from practice in the District Court of the Virgin Islands: Jose Cepeda and Francis Torres for three years, and Eugenio Romero for one year. The sanction imposed upon Esso was the payment of $750,000 to a "Community Service Sanction Account" to be utilized to fund construction of a halfway house on St. Thomas, the training of inmates, and renovation of the St. Thomas Criminal Justice Complex. The sanction imposed upon Goldman Antonetti was the payment of $250,000 to the

6

Community Service Sanction Account (for the same purpose), and the sum of $120,000 as counsel fees and costs ($30,000 incurred by each of four moving parties for time they spent in connection with the sanctions proceedings themselves). Esso was similarly assessed a sanction of $30,000 to be paid to each of four other movants, but Esso has paid that sum and does not challenge it on this appeal.

Goldman Antonetti, its three named partners, and Esso appeal the sanctions imposed against them on a variety of grounds. The parties who were awarded sanctions to compensate them for the time expended in the sanctions hearings have cross-appealed, alleging that they are entitled to sizable additional sanctions for discovery misconduct that caused harm in other phases of the lawsuit, and that the district court abused its discretion in summarily dismissing these other sanctions requests on the grounds that the moving papers were insufficiently specific. Finally, several parties against whom Esso has brought claims for contribution in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") aspect of the underlying district court proceeding (that is all that remains, since the common law claims have been settled) have cross-appealed from the district court's refusal to dismiss those claims as a sanction against Esso for its discovery misconduct.

We will vacate the suspensions imposed upon Cepeda, Torres, and Romero for procedural reasons. They did not receive notice prior to the sanctions hearing that suspension was being considered as a possible sanction. Concomitantly, they did not have the opportunity to properly defend against such a sanction and introduce mitigating evidence. As a result, the court's imposition of sanctions against Cepeda, Torres, and Romero violated due process requirements.

We will also vacate the provision of the district court's order requiring Esso and Goldman Antonetti to pay a total of $1,000,000 to the Community Service Sanction Account. The court simply had no power to order Esso and Goldman Antonetti to pay money to benefit the St. Thomas penal system.

7

We do, however, affirm the sanction of $120,000 against Goldman Antonetti. Although Goldman Antonetti has made quite forceful arguments that its discovery misconduct with respect to the Agrelot summary memo could not have caused all of the costs and expenses claimed by the movants, particularly in view of its having disclosed the 800 pages of technical material on which the memo was based, we cannot say, reviewing the record as a whole, that the district court abused its discretion in awarding sanctions of $120,000. We also reject Goldman Antonetti's contention that it is relieved of the obligation to pay this sanction by a release by which several of the parties gave up claims against Esso and its attorneys. The district court did not clearly err in concluding that the language in the release was not broad enough to cover Goldman Antonetti, Esso's former attorneys, and that the context of the release did not suggest otherwise.

We are also satisfied that the district court did not abuse its discretion in refusing to award additional sanctions because of the failure of the movants to provide papers adequate to assess the harm caused by the violation. District courts, which are extremely busy, should not be burdened with re-inventing the wheel in incredibly complex litigation in order to sort out voluminous sanctions claims.

The foregoing threshold summary effectively disposes of all appeals except the cross-appeals seeking dismissal of the claims for contribution. However, we do not have appellate jurisdiction over these cross-appeals. Because our review of that aspect of the district court's order would necessarily involve an analysis of the merits of the underlying dispute and because the district court's order is reviewable only after final judgment, we do not have jurisdiction over this non-final order under the only potentially viable basis therefor -- the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Co., 337 U.S. 541 (1949). We note in this regard that this aspect of the case differs from the appeal of Goldman Antonetti. Under Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535 (3d Cir. 1985), we have appellate jurisdiction over an order that finally resolves the imposition of sanctions against attorneys no longer in the underlying case. We also

8

review those aspects of the appeal not brought by, but inextricably intertwined with, the issues raised by Goldman Antonetti, i.e., Esso's contentions pertaining to the Community Service Sanction Account and the claims of other parties pertaining to the level of monetary sanctions awarded them, under the doctrine of pendent appellate jurisdiction. See Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir. 1982).

We would prefer to be able to adjudicate the cross-appeals concerning the contribution claims because we have spent a great deal of time both in brief reading and at oral argument in familiarizing ourselves with the case. However, as a court of limited jurisdiction, we do not dispose of matters that are not properly the subject of appellate jurisdiction. We also do not encourage a§ 1292(b) certification because the complexion of the issues involved in these other appeals may change as matters proceed before the district court. The extraordinarily able district judge, who has been adroitly managing this complex and vexatious case for a number of years now, may be able, by subsequent rulings, to put these matters in a sufficiently different light as to render them susceptible to more facile disposition down the road.

I. FACTS AND PROCEDURAL HISTORY

A. Background And Overview

In the summer of 1987, a water well owner noticed the smell of gasoline emanating from his well. He contacted local environmental officials who, with the help of the federal government, began an investigation into possible contamination of the Tutu aquifer. Investigators discovered the presence of gasoline and chlorinated organics in the aquifer. Government officials thereafter closed many of the wells.

The discovery of the contamination led to a number of private lawsuits. Detailed explication of the anatomy of the various suits is unnecessary; it is sufficient to note that the private litigation seeks to assign responsibility for the contamination between and among a number of possible

contaminators, including but not limited to two automobile service stations, an automobile dealer, a shopping plaza, a dry cleaner, and a former textile plant. That private litigation also includes claims for contribution under CERCLA. The parties in the litigation include both possible contaminators and businesses and landowners allegedly harmed by the contamination.[1] The law firm of Goldman, Antonetti, Ferraiuoli & Axtmayer ("Goldman Antonetti") represented Esso for much of the period in question but no longer does so.[2]

Discovery began in 1989. During this discovery, Esso and Goldman Antonetti employed practices the district court found to be sanctionable. In its three opinions regarding the sanctions, the district court grouped the discovery violations into three categories. First, the court found that Esso and its attorneys engaged in a strategy that kept the various other parties in the litigation from obtaining needed information in a timely fashion. See In re Tutu Wells Contamination Litig., 162 F.R.D. 46, 70–71 (D.V.I. 1995) [hereinafter "Tutu I"]. Without delving into the specifics of individual abuses, the court noted that Esso and Goldman Antonetti met many discovery requests with legal tactics intended to delay, oppress, or harass their opponents. Often, Esso and Goldman Antonetti would refuse to turn over requested documents until forced to do so by court

_____

1. The parties relevant to our discussion, are Esso Standard Oil, S.A. Ltd., Esso Virgin Islands, Inc., and Esso Standard Oil Co. (Puerto Rico) (collectively "Esso"); Rhoda Harthman, Charlotte Labarre, Albert Harthman, Arthur Harthman, Austin Harthman, Edgar Harthman, Sammy Harthman, P.I.D., Inc., and Tutu Services Limited (collectively "PID/Harthman") (owners of a shopping center); Texaco, Inc. and Texaco Caribbean, Inc. (collectively "Texaco"); Vernon Morgan; Laga Industries, Ltd., Duplan Corp., Panex Company, Paul Lazare, and Andreas Gal (collectively "the Laga Defendants") (operators of a former textile plant); Four Winds Plaza Partnership ("Four Winds") (owners of a shopping center); Ramsay Motors, Inc. ("Ramsay Motors"); L'Henri, Inc. ("L'Henri") (a dry cleaner); and Western Auto Supply Company ("Western Auto"). Excluded from this list are the plaintiffs from the so-called Total Vision case. None of the plaintiffs in that case are involved in the sanctions dispute.

2. Goldman Antonetti has since changed its name, and is now called Goldman, Antonetti & Cordova.

10

order. According to the court, the level of judicial involvement in the discovery process was consequently unusually high, requiring the court unnecessarily to devote significant resources to resolving ordinary discovery disputes.

Second, the court focused on the handling of the so-called Agrelot memorandum. In December 1989, Soil Tech, a company that specializes in environmental analyses of soil, took samples from the soil at the Esso Tutu Service Station ("ETSS") and from liquid in a holding tank at ETSS. Soil Tech sent those samples to the Environmental Testing and Certification Corp. ("ETC") for analysis. ETC returned the results of the investigation to Soil Tech shortly thereafter. The results revealed some contamination. Jose Agrelot, President of Soil Tech, received the preliminary results and summarized them in a memorandum, which he forwarded to Goldman Antonetti in anticipation of a meeting in January 1990. ETC produced the final results of the testing shortly after the meeting had occurred. Agrelot testified that he discussed the memorandum with attorneys at Goldman Antonetti, including Jose Cepeda and Francis Torres. It is not clear from the record, however, whether Cepeda ever actually saw the Agrelot memorandum at that time. The results were also discussed at a May, 1990 meeting at which Eugenio Romero was present along with Cepeda, Torres, and Agrelot, among others.

Although for the most part the Agrelot memorandum merely summarized the information contained in the ETC findings, the memorandum did include a map pinpointing the locations of the soil borings from which the tested soil was taken. It appears from the record that, without the Agrelot memorandum, someone examining the ETC data could not determine with precision the location of the borings. The record does, however, give some indication that there is enough information in the ETC supporting data that was made available to determine that the ETC analyzed soil from ETSS rather than from some other location above the Tutu aquifer. Esso and its attorneys

11

produced the full ETC report on which the Agrelot memorandum was based.[3]

However, neither Esso, Goldman Antonetti, nor Soil Tech turned over the Agrelot memorandum during discovery until October 1993. Prior to that time, various parties had specifically requested all reports generated from soil and groundwater testing in the Tutu area, but the responses to such requests, either signed by or reviewed by Esso employees or Goldman Antonetti attorneys, made no mention of the Agrelot memorandum. The reasons for this omission are not clear. Lawyers from Goldman Antonetti testified that the Agrelot memorandum had been indexed incorrectly in their computer database; Agrelot himself testified that the memorandum had been labeled incorrectly and therefore misfiled in his office. The district court found that the failure to produce the Agrelot memorandum was intentional. See Id. at 65-66. At all events, only after Agrelot had searched his files in the fall of 1993 to assist Esso in negotiating a case management order did he find the memorandum and turn it over to Esso, who revealed it to its new counsel Archer & Greiner. It was Archer & Greiner that finally notified the other parties of its existence.

The third category of violations occurred in connection with an attempted inspection underneath the surface of the ETSS site. In particular, the plaintiffs wished to determine whether an underground storage tank was located on the

_____

3. It is also not clear from the record, and the parties disagreed at oral argument, when each of the parties received the ETC data and whether Esso and its attorneys complied with court orders governing the production of such material. It seems that the confusion arises because Esso and its attorneys apparently did not physically produce the ETC data to each and every party who may have requested it. However, at oral argument Esso and its attorneys plausibly asserted that court orders managing discovery envisioned that the parties seeking such reports would coordinate among themselves examination of such reports. According to Esso and its attorneys, to avoid duplicative and unnecessary production of lengthy documents (for example, the ETC report exceeds 800 pages) they needed only produce to late-coming parties a list or catalogue of reports already produced, and those parties could then examine the reports in the possession of other parties. We do not resolve this issue here.

12

site, and also to trace the pipes leading out of the oil/water separator located on the site. The parties refer to this aspect of the discovery as the "anomaly investigation." In May, 1992, the plaintiffs employed ground penetrating radar ("GPR") to examine the area beneath the ETSS. The GPR turned up an anomalous shadow in the corner of the site, possibly indicating the presence of an underground storage tank. Esso claimed that the GPR produced a false result because of interference from overhead power lines or from a reinforcing bar in a nearby retaining wall. The magistrate judge ultimately ordered an excavation of the site to determine once and for all if such a tank existed. It did not.

Excavation of the site was to occur in accordance with the magistrate judge's order. However, according to the district court, Esso failed to comply with this order. See Id. at 52-53. Instead, Esso began the excavation after a delay of several hours and did not have the necessary tools or machinery ready for the investigation. Further, Esso did not adequately conduct the pipe tracing phase of the investigation. This failure led to months of wrangling among the parties and between Esso and the court until Esso finally conducted the investigation to the satisfaction of the court, nearly 10 months after the investigation was scheduled to be completed.

B. The District Court's Opinions and Orders

In three separate opinions, the district court discussed its findings with respect to these violations and issued orders imposing sanctions for them. In the first of the three opinions, the court began by detailing the anomaly investigation, see id. at 51-54, and the Agrelot memorandum affair, see id. at 54-62. The court went on to describe briefly the sources of law on which it planned to rely in imposing sanctions: its inherent powers; Federal Rules of Civil Procedure 11, 26(g), and 37; and 28 U.S.C. § 1927. See id. at 62-63. The court next found that the failure to produce the Agrelot memorandum was not inadvertent and that this failure was non-responsive to discovery requests, notwithstanding the fact that the ETC

13

data on which the memorandum relied was actually produced. See id. at 65-71.

Finally, the court examined the possible sanctions. It observed that monetary awards for the fees and costs associated with the attempts to find evidence of the release of contaminants from the ETSS, the investigation costs resulting from the failure to produce the Agrelot memorandum, and the fees and costs incurred as part of the sanctions proceedings were all potentially recoverable.

See id. at 72–73. After reviewing the controlling case of Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863 (3d Cir. 1984), the court reasoned that dismissal of Esso's CERCLA contribution claims against the other parties was also possible. See id. at 73–78. It concluded its discussion of possible sanctions by finding that Cepeda, Romero, and Torres could be sanctioned for their role in the discovery violations. See id. at 78–80.

Instead of imposing sanctions at that time, the court ordered that Esso, Goldman Antonetti, Cepeda, Romero, and Torres show cause why the court should not sanction them for their actions. The court also provided the parties with the opportunity to negotiate a mutual resolution of the monetary sanctions prior to the hearing to show cause. See id. at 81.

In its next opinion on the matter, the court disposed of motions from Esso, Goldman Antonetti, Cepeda, Romero, and Torres seeking clarification, reconsideration, and modification of its earlier orders. First, the court disposed of claims that its hearings with respect to sanctions were conducted without due process. The court engaged in a detailed review of the orders, discussions, and hearings leading up to the sanctions proceedings and concluded that, taken together, the process provided ample notice of and opportunity to be heard regarding the sanctions faced by the various parties. See In re Tutu Wells Contamination Litig., 162 F.R.D. 81, 83–88 (D.V.I. 1995) [hereinafter "Tutu II"]. Next, the court held that the moving parties had produced no evidence sufficient to warrant a reexamination of its earlier factual findings. See id. at 88–89. Finally, the court rescribed its earlier holding that the actions of the moving parties prejudiced the other parties. See id. at 90–

14

91. Esso, Goldman Antonetti, Cepeda, Romero, and Torres therefore still were required to show cause why monetary sanctions and dismissal of claims should not be imposed on them. See id. at 91.

In its third and final opinion on the matter, the court decided what sanctions to impose on each of the parties. It began by finding that neither Esso, Goldman Antonetti, Cepeda, Romero, nor Torres had shown sufficient cause for the court not to impose some sanction on each of them. See In re Tutu Wells Contamination Litig., 166 F.R.D. 331, 334–39 (D.V.I. 1996) [hereinafter "Tutu III"]. Instead, the court found that severe sanctions were merited. Because of the need to impose such severe sanctions, the court decided to rely exclusively on its inherent power to sanction. See id. at 337. As for non-monetary sanctions, the court first held that dismissing the CERCLA contribution claims would be inappropriate because doing so would place too great a burden on Esso to clean up the contamination of the aquifer (the court apparently believed that other parties shared responsibility for the contamination). Instead, the court reasoned that monetary sanctions would be adequate to achieve the goals of sanctioning. See id. at 339–40. Next, the court suspended Cepeda, Romero, and Torres from practicing before the District Court of the Virgin Islands. See id. at 339–41.4 Cepeda and Torres received three-year suspensions. Because of contrition expressed to the court, Romero received a suspension of only one year. See id. at 341.

As for monetary sanctions, the court declined to award substantial sanctions in favor of the parties to the lawsuit (who had been unable to settle the monetary sanctions). See id. at 341–45. The parties to whom sanctions might be paid had submitted their requests for fees and costs to the court for review. The court found, however, that the submissions, which were voluminous but quite generalized, failed to make clear the basis for the parties' claims and

_____

4. Romero and Torres were admitted to practice before the court pro hac vice. There is some dispute as to whether Cepeda was technically admitted. Because of the particular manner in which we resolve the appeal of the suspensions, we do not resolve this issue here.

15

failed to provide records sufficient to justify the requested awards as sanctions. Instead of examining the submissions line-by-line, which the court did not feel obliged to do given the failure of the parties to be sufficiently specific, the court denied the bulk of the requests. See id. at 342-43. However, the court did believe that some sanction was warranted. It held that the costs associated with the sanctions proceedings themselves would be an appropriate sanction. To determine those costs, the court, expressing admiration for the stewardship of Nancy D'Anna, counsel for L'Henri, used the submissions of L'Henri as a model.

L'Henri sought approximately $30,000 as costs for the sanctions proceedings. The court decided that such an award was reasonable, and awarded all eight parties seeking monetary sanctions $30,000 each. See id. at 344. Because Esso and Goldman Antonetti were equal partners in the discovery violations, the court reasoned, each should bear equally the burden of the sanction. See id. Therefore, the court ordered Esso to pay $30,000 each to Ramsay Motors, L'Henri, PID/Harthman, and Vernon Morgan. See id. Since Esso had already negotiated a settlement with these four parties as to monetary sanctions, and paid them a total of approximately $170,000, the court considered this portion of Esso's sanction to be satisfied. See id. at 344 n.13. The court ordered Goldman Antonetti to pay $30,000 each to the other movants, Four Winds, the Laga Defendants, Western Auto, and Texaco. See id. at 344.

Finally, the court determined that additional sanctions against Esso and Goldman Antonetti were required. See id. at 345-52. Recognizing that it was adopting a novel approach to sanctioning, the court ordered Esso to pay $750,000 and Goldman Antonetti to pay $250,000 to a Community Service Sanction Account that would be used to fund construction of a halfway house on St. Thomas, the training of inmates, and renovation of the St. Thomas Criminal Justice Complex. See id. The court opined that the parties truly harmed by the contamination of the Tutu aquifer and the delay in resolving responsibility over the contamination were the citizens of the Virgin Islands. Therefore, the most appropriate beneficiary of a sanction award, it reasoned, would be the Virgin Islands itself. And,

16

because the Criminal Justice Center was in such great need of additional resources, it would be, the court believed, a suitable project towards which the funds could be directed.

C. <u>Anatomy of the Appeals</u>

These appeals ensued. The following is a capsule summary of those appeals. Esso and Goldman Antonetti appeal the court's decision to use its inherent powers to require that they pay a total of $1,000,000 towards the Criminal Justice Center. Goldman Antonetti also appeals the imposition of the $120,000 monetary sanction payable to the other parties in the case. Cepeda, Romero, and Torres appeal their suspensions from practicing law in the Virgin Islands. Four Winds, L'Henri, Vernon Morgan, PID/Harthman, Ramsay Motors, and Texaco appeal the court's decision to award only $30,000 to each of them as a sanction from either Esso or Goldman Antonetti; all of these parties argue that they are entitled to additional awards. Neither the Laga Defendants nor Western Auto has appealed, though Western Auto argues that should we determine that parties are entitled to additional sanctions, it should be similarly entitled.[5] The Department of Justice of the Virgin Islands has submitted an amicus curiae brief urging us to uphold the sanction award directed towards the Criminal Justice Center.

Some aspects of our appellate jurisdiction over this matter are complicated. Because our jurisdiction in this case depends on the particular aspect of the appeal that we are examining, we will discuss jurisdiction together with each aspect of the merits.

_____

5. Because we find that no party is entitled to additional sanctions, we do not reach the question whether Western Auto would be entitled to additional sanctions even though it has not appealed.

II. SUSPENSIONS OF ATTORNEYS CEPEDA,
ROMERO, AND TORRES

A. Appellate Jurisdiction

Appellate jurisdiction over the appeals of Cepeda,
Romero, and Torres arises from 28 U.S.C. § 1291, which
provides that the United States Court of Appeals for the
Third Circuit has jurisdiction over appeals of final decisions
of the District Court of the Virgin Islands. "[A] decision is
ordinarily considered final and appealable under § 1291
only if it `ends the litigation on the merits and leaves
nothing for the court to do but execute the judgment.' "
Quackenbush v. Allstate Ins. Co., ___ U.S. ___, 116 S. Ct.
1712, 1718 (1996) (quoting Catlin v. United States, 324 U.S.
229, 233 (1945)). In this case, the decision to suspend
Cepeda, Romero, and Torres is not final in the usual sense.
The claims for CERCLA contribution still exist; therefore,
the litigation on the merits has not ended and the court has
more to do than simply execute the judgment.6

Under the collateral order doctrine, however, an
otherwise non-final decision can be appealed if it finally
and conclusively determines the disputed question, resolves
an important issue separate from the underlying merits,
and is effectively unreviewable after final judgment. See
Cohen, 337 U.S. at 546. It is unquestionable that the order
from which Cepeda, Romero, and Torres appeal finally and
conclusively determines the issue of their suspensions. We
turn to whether the order resolves an important issue
completely separate from the merits that is effectively
unreviewable after final judgment.

Addressing these issues slightly out of order, we begin
with the question whether the order suspending Cepeda,
Romero, and Torres is effectively reviewable after final
judgment. Subsequent to the actions that gave rise to their
suspensions, their former client, Esso, retained other
counsel. Cepeda, Romero, and Torres are no longer in the
underlying litigation at all. In Eavenson, Auchmuty &

_____

6. The claims for CERCLA contribution were separated from the
common-law claims and have been stayed.

18

_Greenwald v. Holtzman_, 775 F.2d 535 (3d Cir. 1985), we held that an order imposing Rule 11 sanctions against an attorney no longer representing a party in a case was collaterally final under _Cohen_. _See id._ at 538–40. In that case, we reasoned that the attorney could not effectively appeal the sanctions after final judgment because the parties to the suit might not appeal, leaving open the possibility that the attorney would be unable to appeal his sanction, and, even if he were able to appeal, the attorney may be unaware of the entry of final judgment, leaving open the possibility that he would be unable to file a timely notice of appeal. _See id._ at 538–39. _Eavenson Auchmuty_ therefore controls our inquiry and leads us to conclude that the order from which Cepeda, Romero, and Torres appeal is effectively unreviewable after final judgment.

The next question is whether our review of the order imposing sanctions will force us to examine the merits of the underlying case thereby rendering the appeal not completely separate from the merits. We have followed the rule that a "finding of separateness [in this regard] is dependent on the facts" in any given case. _Martin v. Brown_, 63 F.3d 1252, 1261 n.11 (3d Cir. 1995).7  Here, our review of the order suspending Cepeda, Romero, and Torres would not force us to examine the merits of the case at all. Cepeda, Romero, and Torres each argue that the district court failed to afford them due process of law. Reviewing such a claim would require our examining the notice the court gave to Cepeda, Romero, and Torres, and the opportunity it gave them to be heard on the matter. This

_____

7. The rule in _Martin_ is derived in part from two of our prior cases. In _Eavenson Auchmuty_, the Rule 11 sanction arose from the alleged violation of a court order, and resolution of the sanctions issue therefore did not touch on the merits of the underlying case. Rather, the sanctions issue turned on the interpretation of the order. _See id._ at 538, 541–43. We distinguished the facts of _Eavenson Auchmuty_  from those in _Eastern Maico Distribs., Inc. v. Maico-Fahrzeugfabrik, G.m.b.H._, 658 F.2d 944 (3d Cir. 1981), where the validity of the sanction turned in part on whether the material requested during discovery was relevant to the merits of the litigation. _See id._ at 947. Neither _Eastern Maico_ nor _Eavenson Auchmuty_ adopted a bright-line rule. Rather, taken together, the two cases suggest that a determination of separateness in this context must be on a case-by-case basis.

review of the process by which the court imposed the sanctions in no way touches on the merits.

Finally, we must consider whether the process due an attorney prior to a court's suspending him is important in the Cohen sense. "[A]n issue is important if the interests that would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by adherence to the final judgment rule." In re Ford Motor Co., 110 F.3d 954, 959 (3d Cir. 1997). We addressed this very issue in Martin, and concluded that protection of the constitutionally recognized right of due process in this context is sufficiently important to warrant immediate appeal. See Martin, 63 F.3d at 1261. This is especially true where, as here, the sanction imposed is not a mere monetary fine but the more severe sanction of the suspension of an attorney from practicing before a court. Suspension, much more than a fine, "impose[s] significant burdens on the reputation and career opportunities of the sanctioned attorney." Id. Therefore, relying on Martin, we hold that the issue raised by Cepeda, Romero, and Torres on appeal satisfies the importance prong of the Cohen test.

In sum, because we believe that the order suspending Cepeda, Romero, and Torres is collaterally final under Cohen, we hold that we have jurisdiction over the appeal of that order.

B. The Process Due Prior to Suspending an Attorney

Cepeda, Romero, and Torres submit that their suspensions cannot stand because the district court did not afford them particularized notice of the form of the sanctions they faced. They had no way of knowing, they contend, that the possibility of suspension as a sanction existed. Therefore, they conclude, their right to due process was infringed. Our review is plenary. See Martin, 63 F.3d at 1262.

In considering the suspension of an attorney as a sanction, courts must provide the attorney with due process. Eash v. Riggins Trucking, Inc., 757 F.2d 557, 570 (3d Cir. 1985) (noting that the imposition of a sanction on

20

an attorney, including disbarment and other disciplinary actions, implicates due process concerns); cf. Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980) ("Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record."); Rogal v. American Broad. Cos., 74 F.3d 40, 44 (3d Cir. 1996) ("The imposition of monetary sanctions by a court implicates fundamental notions of due process . . . ."). Although the precise contours of the process that is due varies given the particular context, "the fundamental requirements of due process -- notice and an opportunity to respond -- must be afforded before any sanction is imposed." Martin, 63 F.3d at 1261. Similarly, prior to the suspension of an attorney from practicing before the District Court of the Virgin Islands because of misconduct as defined by local rule, an attorney must be provided "notice and an opportunity to be heard." D.V.I. R. 83.2(b)(4)(A).

The party against whom sanctions are being considered is entitled to notice of the legal rule on which the sanctions would be based, the reasons for the sanctions, and the form of the potential sanctions. See Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994). Without such notice, the opportunity to be heard would be meaningless: "[o]nly with this information can a party respond to the court's concerns in an intelligent manner." Id. In other words, a party cannot adequately defend himself against the imposition of sanctions unless he or she is aware of the issues that must be addressed to avoid the sanctions. As one treatise writer has explained, "[d]ramatic differences in the relief being considered by the district court may lead to substantially different (e.g., more detailed, differently directed) responses by the alleged offender." Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 17(D)(1)(d), at 343 (2d ed. 1994) (discussing Rule 11 sanctions in particular).

A brief examination of three of our cases illustrates the operation of this notice rule and the policy justifications supporting it. In Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215 (3d Cir. 1995), we rejected a party's argument that he was denied adequate

21

notice because of the failure to notify him that sanctions under 28 U.S.C. § 1927, in addition to those under Rule 11, were being considered. We noted that a showing of bad faith conduct is required to impose sanctions under § 1927 but is not required under Rule 11. See id. at 1225. Without notice that possible § 1927 sanctions were at stake, a party might not employ his opportunity to be heard to rebut charges of bad faith. However, our examination of the context and the factual background of the case revealed that the party was well aware that he was being charged with bad faith conduct. See id. at 1226–27. That he was unaware of the possible § 1927 sanctions was immaterial, for he knew that he would need to confront the charge of bad faith conduct to defend himself in the sanction proceeding. In short, our concern in Fellheimer was that the party in fact had the opportunity to mount a meaningful defense. When it became evident that under the circumstances he did, we determined that the notice had been adequate.

In our discussion in Fellheimer, we distinguished Jones v. Pittsburgh National Corp., 899 F.2d 1350 (3d Cir. 1990). In Jones, the party was not explicitly notified of the possibility of § 1927 sanctions, nor did the context or factual background of the case suggest that he was charged with bad faith conduct. See id. at 1357. Because the party was not "on notice as to the particular factors that he must address if he is to avoid sanctions," notice was inadequate. See id.

Although in both Fellheimer and Jones we focused on notice as to the legal rule on which the sanctions were based, particularized notice must also be given as to the form of the contemplated sanction, as is illustrated in Gagliardi v. McWilliams, 834 F.2d 81 (3d Cir. 1987) (per curiam). In Gagliardi, the party moving for sanctions under Rule 11 sought attorney's fees, dismissal of the underlying claim, and other relief the court might deem appropriate. See id. at 83. The court granted the sanctions in the form of an injunction. We explained that the general request for other appropriate relief did not put the party on notice that injunctive relief was possible. See id.8 Therefore, we vacated the award of sanctions and remanded so that the party

---

8. We noted that the party against whom sanctions were imposed was proceeding pro se; however, we also noted that "[e]ven an experienced attorney would not have expected this type of injunctive sanction without some more specific notice." See Gagliardi, 834 F.2d at 83.

22

could be notified of the possibility of an injunction and respond accordingly. See id.

In the present case, neither Cepeda, Romero, nor Torres received particularized notice that the court was contemplating suspending them from practicing law as a sanction. Although the court made clear the legal rules on which it would base sanctions and the reasons for the sanctions, the court limited its discussion of the form of the possible sanctions to monetary sanctions and dismissal of claims. See, e.g., Tutu II, 162 F.R.D. at 91. As far as we can tell, the possibility of suspension arose for the first time in the court's third and final published opinion on the matter, when the court actually imposed the suspensions. Neither did the parties moving for sanctions seek suspension; their papers before the district court sought only monetary sanctions and dismissal.9

A number of parties have pointed to two judicial pronouncements that they contend should have put Cepeda, Romero, and Torres on at least constructive notice of the possibility of suspension. Even assuming that constructive notice would be sufficient, a doubtful proposition, we find these pronouncements to be inadequate. First, the court did mention, in passing during an October 28, 1993, hearing, the possible "breach of the Canon of Ethics." The court did not elaborate nor did it ever again raise the "Canon of Ethics." This mention is simply too vague, inconclusive, and preliminary to put Cepeda, Romero, or Torres on notice of the possible sanction of suspension.

Second, the court noted that it planned to utilize its inherent powers as a basis for sanctions. A number of parties submit that, because a court may employ its inherent powers to suspend an attorney, Cepeda, Romero, and Torres should therefore have been on notice that the court was considering suspension. We are unpersuaded. As we discuss infra, a court's inherent powers put at its disposal a wide range of possible sanctions. Surely we cannot expect a party to defend against each and every one

_____

9. We are here relying on the assertions of Romero in his Brief of Appellant, and no party has asserted anything to the contrary.

of these possible sanctions simply because a court signals its intention to rely on such powers. Rather, more particularized notice is required. In this respect, we rely upon Gagliardi, 834 F.2d at 83. Just as in Gagliardi, in which we held that a request for any remedy the court might deem appropriate was too general to put a party on notice that an injunction might issue, we hold that the mere mention of a court's inherent powers does not put a party on notice that suspension is a possible sanction.

Knowing that they faced possible suspension as well as possible monetary sanctions would have been vitally important to Cepeda, Romero, and Torres as they prepared for the sanctions proceedings. In addition to presenting legal and factual arguments pertaining to the particular conduct that gave rise to the sanctions proceedings and their individual culpability, the attorneys likely would have presented evidence concerning their professional careers, their contributions to the legal profession and the community, their character, and the like. The proceedings would have followed a different path as the alleged offenders led the court to consider a wider array of information. Put differently, had Cepeda, Romero, and Torres been on notice that they faced suspension, they doubtless would have utilized their opportunity to be heard to raise different matters. As it happened, because of the lack of notice, the attorneys' opportunity to be heard was less than meaningful; they were not given the appropriate opportunity to present relevant defenses to the penalties which they were ultimately assessed.

We conclude that neither Cepeda, Romero, nor Torres received the particularized notice to which they were entitled. Because their rights to due process were violated, we will vacate that portion of the order on appeal suspending them from practice in the District Court of the Virgin Islands.10

_____

10. Any suspension from practice, even in a jurisdiction in which an attorney does not regularly practice, would leave an indelible and deleterious imprint on the attorney's career, reputation, and future opportunities. Although we do not reach the question, we do express our doubt that, even on the record as developed, the extreme sanction of

24

III. THE COMMUNITY SERVICE SANCTION

A. <u>Appellate Jurisdiction</u>

As we discussed <u>supra</u>, part II, section A, although the order from which Esso and Goldman Antonetti appeal, which imposes on them a monetary sanction payable to the Community Service Sanction Account, is not final for the purposes of § 1291, the order as to Goldman Antonetti is collaterally final under the <u>Cohen</u> doctrine, for the same reasons the appeal of Cepeda, Romero, and Torres was collaterally final. <u>See supra</u> part II, section A.11 However, the collateral order doctrine does not provide us jurisdiction over Esso's appeal. Esso remains a party in the underlying litigation and can therefore bring an effective appeal after final judgment. In other words, Esso does not fall within the ambit of <u>Eavenson, Auchmuty</u>, and its appeal fails the third prong of the <u>Cohen</u> test. However, as we shall explain, we have pendent appellate jurisdiction over Esso's appeal.

The doctrine of pendent appellate jurisdiction, in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and

_____

suspension from practice was justified for the individual actions (or inactions) of Cepeda, Romero, and Torres. It would unduly prolong an already lengthy opinion to detail our reasons for this doubt, predicated as it is on a large record. We do, however, note that we do not suggest that district judges should never use suspension as a sanction. We also do not reach the issue whether Cepeda's <u>pro hac vice</u> status, <u>see supra</u> note 4, has any bearing on the ability of the court to suspend him.

11. The only difference is whether the issue is important in the <u>Cohen</u> sense. We have held that resolution of a serious and unsettled question of law satisfies the importance criterion of <u>Cohen</u>. <u>See In re Ford</u>, 110 F.3d at 961. Here, Esso and Goldman Antonetti appeal the district court's use of its inherent powers to require them to fund a Community Service Sanction Account for the benefit of the Virgin Islands, a third party to the litigation. We are unaware of any appellate decision that addresses this question. And, without guidance, the novel approach adopted by the district court might be emulated. The appeal, therefore, implicates a serious and unsettled question.

independently exercises its jurisdiction. See, e.g., 16 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3937, at 684–85 (2d ed. 1996). We recognize the doctrine of pendent appellate jurisdiction and have on a number of occasions discussed its scope. See, e.g., Nat'l Union Fire Ins. Co. v. City Sav. F.S.B., 28 F.3d 376, 382–83 & n.4 (3d Cir. 1994); Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 208–09 (3d Cir. 1990); United States v. Spears, 859 F.2d 284, 287 (3d Cir. 1988); Kershner v. Mazurkiewicz, 670 F.2d 440, 445–59 (3d Cir. 1982).

We have held that the discretionary exercise of pendent appellate jurisdiction is appropriate when the issue over which we have jurisdiction cannot be resolved without reference to the otherwise nonappealable issue. See Kershner, 670 F.2d at 449. In that sense, the exercise of pendent appellate jurisdiction ensures that our review of the independently appealable issue is meaningful. See Nat'l Union Fire, 28 F.3d at 382. Unfortunately, our jurisprudence in this area is not systematic, and it is not clear how broadly the doctrine applies in our circuit. It does, however, apply here.12

_____

12. There are other matters that need mention with respect to our exercise of pendent appellate jurisdiction. The appeal in question here is pendent to a collaterally final order, rather than to an order the interlocutory appeal of which is permitted by statute. The Supreme Court has stated that pendent appellate jurisdiction in such cases and under certain circumstances is not permitted. See Swint v. Chambers County Comm'n, ___ U.S. ___, 115 S. Ct. 1203, 1209–11 (1995); Abney v. United States, 431 U.S. 651, 663 (1977). However, those cases deal with pendent issues, not pendent parties. And, at least in Swint, the Court made clear that its holding did not necessarily extend to circumstances in which the issues on appeal were "inextricably intertwined" or in which review of the otherwise nonappealable issue "was necessary to ensure meaningful review of the" independently appealable issue. Swint, 115 S. Ct. at 1212. In Spears, we employed the doctrine of pendent appellate jurisdiction in a case in which the independently appealable order was appealable only because of the collateral order doctrine. See Spears, 859 F.2d at 286–88. We noted there that there was sufficient overlap in the facts relevant to the issues to allow us to exercise pendent appellate jurisdiction. See id. at 287–88.

26

This case presents for our consideration two appeals raising the identical legal challenge, one appeal that is collaterally final (Goldman Antonetti's) and one that is not (Esso's). Should we decline to exercise jurisdiction over Esso's appeal, we would surely face the issue again, after final judgment, at which time our resolution of Goldman Antonetti's appeal -- either because of collateral estoppel, the doctrine of the law of the case, or our own precedent -- would govern the outcome. In other words, for all practical purposes, our resolution of Goldman Antonetti's appeal resolves Esso's appeal. It makes little practical sense, then, to dismiss Esso's appeal for lack of jurisdiction, and we shall not do so. See Spears, 859 F.2d at 288 ("In these circumstances, considerations of judicial economy, the litigant's interests, and practicality demand that we exercise jurisdiction over the [otherwise nonappealable] appeal.").

As a final note on this subject, the use of the doctrine here would constitute pendent party appellate jurisdiction. See 16 Wright, Miller & Cooper, supra, § 3937, at 690-96. Pendent appellate jurisdiction has heretofore only been employed to allow our review of an otherwise non-appealable issue related to an appealable issue, both issues having been appealed by the same party. Here, we employ pendent appellate jurisdiction to allow our review of related issues that have been appealed by two different parties. However, the case for exercising pendent (party) appellate jurisdiction here is so compelling and the circumstances of this appeal so unusual that we do not extend the law by much in holding that pendent appellate jurisdiction applies.

B. The Appropriateness of the Community
Service Sanction

As previously noted, the district court employed its inherent powers to sanction Esso and Goldman Antonetti. A threshold question, then, might be whether the court's resort to the inherent powers, in lieu of the rule-based and statute-based sanctions -- e.g., Fed. R. Civ. P. 11, 16, and 37, or 28 U.S.C. § 1927 -- was appropriate.13 We need not

_____

13. In Chambers v. NASCO, Inc., 501 U.S. 32 (1991), the Supreme Court discussed at length the inherent powers of a court to sanction and their

27

reach this question, however. As we shall discuss more fully below, the court had no authority under its inherent powers to impose the type of sanction it did. We are here reviewing a pure question of law; therefore, our standard of review is plenary. See Public Interest Research Group of New Jersey, Inc. v. Windall, 51 F.3d 1179, 1184 (3d Cir. 1995) [hereinafter "PIRG"].

The permissible scope of inherent powers is somewhat unclear; we have earlier observed that "the notion of inherent power has been described as nebulous, and its bounds `shadowy.' " Eash v. Riggins Trucking Inc., 757 F.2d 557, 561 (3d Cir. 1985) (en banc) (citation omitted). However, "courts under their inherent powers have developed a wide range of tools to promote efficiency in their courtrooms and to achieve justice in their results." Id. at 564. The Supreme Court has furnished us with at least a partial list of a court's inherent powers. Employing its inherent powers, a court can control admission to its bar, discipline attorneys, punish for contempt, vacate its own judgment upon a finding of fraud, bar a criminal defendant from a courtroom for disruptive behavior, dismiss a suit on forum non conveniens grounds or for failure to prosecute, and assess attorney's fees. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991).

In addition to those mentioned by the Supreme Court, other inherent powers include the power to fine, to disqualify counsel, to preclude claims or defenses, and to limit a litigant's future access to the courts. See Joseph, supra § 28, at 440-47; see also Republic of the Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 n.10 (3d Cir. 1994) (listing the inherent powers available to a court). With these many bows in their sanctioning quivers, courts

_____

relationship to rule-based and statute-based powers to sanction, e.g., Rule 11, Rule 16, Rule 37, and § 1927. To oversimplify somewhat, the Court held that the existence of rule-based or statute-based powers does not preclude a court's employing its inherent powers. See id. at 46-51. The Court observed, but apparently did not require, that normally a court should look first to those rule-based or statute-based powers before turning to its inherent powers, reserving the inherent powers for instances in which the rule-based or statute-based powers are not "up to the task." See id. at 50.

have frequently invoked their inherent powers "to regulate the conduct of the members of the bar as well as to provide tools for docket management." Eash, 757 at 561.

Notwithstanding the variety of tools available to a court under its inherent powers, we believe that an order directing a party to the litigation to remit funds to a third party is outside the scope of a court's inherent powers. We begin our analysis by noting that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44. That "inherent powers are shielded from direct democratic controls" makes this exercise of restraint and discretion even more important. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980).

"A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers, 501 U.S. at 44–45 (emphasis added). Whether creation of the Community Service Sanction Account before us here is appropriately within the scope of a court's inherent powers turns on the source of a court's inherent powers. The Supreme Court discussed the genesis and nature of inherent powers in Chambers. Inherent powers derive from the very nature of courts of justice. See id. at 42. Necessarily incident to the act of creating courts is the act of imbuing these institutions with certain indispensable powers to " `manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " Id.  (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630–31 (1962)). Inherent powers are sometimes described, in other words, as those "necessary to the exercise of all others." Id. (quoting United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812)). In Eash, we described the source of inherent powers in slightly different words. We suggested that inherent powers fall into three distinct categories: powers arising from Article III, powers arising from the nature of the court, and powers arising from historical notions of the courts of equity. See Eash, 757 F.2d at 562–64.[14]

_____

14. Because Eash's categorization scheme was intended largely as a means of explaining the relationship between inherent judicial powers

29

No matter where one places their origin, it is clear that the power exercised in this case cannot be derived from a court's inherent powers. The district court's actions are essentially legislative in nature. Although we recognize that the line between a judicial act and legislative act is difficult to fix with certainty, see, e.g., Mistretta v. United States, 488 U.S. 361, 380–408 (1989); see also Clinton v. Jones, ___ U.S. ___, ___ S. Ct. ___, No. 95–1853, 1997 WL 273679, at *10 (U.S. Sup. Ct. May 27, 1997) ("Of course the lines between the powers of the three branches are not always neatly defined."), the district court's sanction here falls on the legislative side of whatever line we may draw. The court ordered the reallocation of resources from private entities to an agency of the public sector not a party in the case.15 It

---

and legislatively granted judicial powers, and because it is not necessary to tackle the difficult question of that relationship, see supra n.12, we have no occasion to revisit this categorization here. See also Chambers, 501 U.S. at 47 n.12 (describing Eash's categorization scheme and concluding that discussion of it is unnecessary).

15. We have addressed a similar question in the criminal context. See, e.g., United States v. John Scher Presents, Inc., 746 F.2d 959 (3d Cir. 1984). In that case, we rejected a district court's conditioning probation on the donation of $100,000 to charity. We held that the power of the court to place a defendant on probation arose from the probation statute, not from inherent powers. See id. at 961. We further held that the probation statute did not give courts the power to condition probation on the donation of money to a charity. See id. at 963–64. This decision was consistent with the decisions of other circuits addressing the same issue. See, e.g., United States v. Missouri Valley Constr. Co., 741 F.2d 1542, 1546–51 (8th Cir. 1984) (en banc); United States v. Wright Contracting Co., 728 F.2d 648, 650–53 (4th Cir. 1984).

Although decided on facts somewhat analogous to those presented here, these cases provide little guidance. They do not discuss the scope of a court's inherent powers except to note that the power to suspend a criminal sentence and impose probation is not a power inherent in the courts. Rather, the focus of these cases is on whether the statutory grant of power to impose probation allows the courts to condition probation on a payment of charity. Here, by contrast, we know that the power to sanction is inherent in the courts. We are thus concerned with the scope of inherent, not statutory, powers. Therefore, that a district court cannot condition probation on the payment of charity does not control whether a district court can require the payment of charity as a sanction. Put differently, the existence of a limit on a court's statutory powers does not necessarily mean that there is a corresponding limit on a court's inherent powers.

30

chose from whom the resources would be taken and to whom the resources would redound, without regard to the anatomy of the case before it. In so doing, the court ventured well beyond the case and controversy before it.16

We do not find persuasive the argument that a court's inherent powers include the wielding of what is essentially a legislative power. We believe that it is not in the nature of courts of justice normally to engage in the redistribution of wealth to parties outside of the litigation. We find nothing in Article III that allows for such a power. Further, we do not believe that such a power is necessary for the efficient functioning of a court. Fines made payable to the court would do just as well in ensuring that parties do not interfere with that functioning. From the standpoint of the sanctioned party, the disciplining effect of a fine made payable to the court is no different from the disciplining effect of a sanction made payable to some third party; the sanctioned party is out of pocket the same amount either way. Finally, we have been directed to no historical evidence demonstrating that courts of equity had this power, and given that the inherent powers must be exercised with restraint, we see no reason to permit this power now.

As our discussion makes clear, the court redistributed a portion of the wealth in the Virgin Islands, not from one party in the litigation to another, but from one party in the litigation to another party of the court's choosing. We acknowledge that this reallocation occurred under the aegis of a sanctions proceedings; however, we may not be

---

16. In the context of administrative law, commentators have drawn the line between legislative and adjudicative functions by referring to the factual evidence on which the relevant government body relies in making its decision. See 2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 9.2, at 7–8 (3d ed. 1994). "[L]egislative facts are the general facts that help a government institution decide questions of law, policy, and discretion." Id. These are facts that concern more than just an individual. See id. Here, the court had to rely on facts outside of those provided it by the parties to determine that the Virgin Islands prison system was an appropriate recipient of funding. In that sense, the court was searching for legislative facts. It was, in that same sense, engaging in a nonadjudicatory function.

31

prevented from looking beyond mere labels to the underlying reality of the particular exercise of governmental power. See Mistretta, 488 U.S. at 393. The reality in this case involved the exercise of legislative power.

We appreciate the sense of outrage that motivated the district court's decision to impose the community service sanction. The contamination of the Tutu aquifer was tragic, and the delay in determining responsibility for that contamination is doubtless frustrating. The community service sanction, at least on its face, is attractive because it seeks to punish those who have caused, at least in part, that delay and assist those who might have been harmed by the contamination. In that sense, the district court's actions were admirable. However, a court does not always do well by doing good. Though we applaud the district court's motives, we are constrained to find fault with its remedy.[17]

In sum, we hold that the district court's inherent powers can not support the imposition of the community service sanction.[18]

---

17. Our conclusion that the creation of the Community Service Sanction Account was beyond the powers of the district court is bolstered by our canvass of the law of our sister circuits. We are unaware of any court of appeals that has imposed this type of community service sanction. Nor do we find helpful the sources to which the district court cites for support of its proposed sanction. The district court could cite only to a law review article. See Brent Fisse, Reconstructing Corporate Criminal Law: Deterrence, Retribution, Fault, and Sanctions , 56 S. Cal. L. Rev. 1141 (1983). The article itself cited to two district court criminal cases in which, the article claimed, the courts imposed monetary sanctions directed to a community service project. See United States v. Olin Corp., Crim. No. 78-30, slip op. (D. Conn. June 1, 1978); United States v. Allied Chem. Corp., 420 F. Supp. 122 (E.D. Va. 1976). We find no support in those cases for imposing such a sanction here. The opinions themselves do not discuss the sanctions at all, though the law review article claims that the monetary sanctions were imposed as conditions for probation or nonprosecution. We cannot say for certain because of the lack of discussion by each of the courts on the matter, but we suspect that the courts' actions would be impermissible under the (old) probation statute. See supra note 15.

18. Moreover, we have serious doubts that one could plausibly argue that Congress provided the courts -- by statute or by rule -- the power

32

IV. MONETARY SANCTIONS

A. Appellate Jurisdiction

We have jurisdiction over Goldman Antonetti's appeal challenging the imposition of the monetary sanctions directed to the other parties in the litigation pursuant to Eavenson Auchmuty. See supra part II, section A; part III, section A.19 As for the appeals of the remaining parties, we believe that we have jurisdiction over these appeals under the pendent appellate jurisdiction doctrine.20

As we discuss more fully infra part IV, section B, the remaining appeals (other than Goldman Antonetti's) contend that in imposing those sanctions the district court failed to account for the full extent of the harm caused by Esso's and Goldman Antonetti's discovery violations. These appeals are closely intertwined with Goldman Antonetti's appeal. The appropriate level of monetary sanctions for discovery abuse payable to a party in the litigation (the substance of the remaining parties' appeals) is, in part, dependent on the costs associated with the conduct giving

_____

to impose the type of sanction imposed here. In order to provide such power, we believe three criteria must be satisfied: (1) this must be a power that Congress can constitutionally delegate to a coordinate branch; (2) Congress must clearly indicate its intent to delegate this power; and (3) Congress must provide intelligible principles to guide the courts in the exercise of this power. None of these criteria is satisfied here."

19. The substantive issues we will discuss here, see infra part IV, section B, are separate from the merits of the case. Therefore, there is no concern that the second prong of the Cohen test, which includes the requirement that the issue on appeal be separate from the merits of the underlying dispute, is not satisfied. The issues we discuss concern primarily the propriety of basing a sanction award on the costs associated with the sanctions proceedings themselves and the responsibility an aggrieved party has to detail for the court the harm a discovery violation caused him. Neither of these issues touches the merits of the underlying dispute. Further, because the circuit law on these subjects is somewhat unsettled, we believe that the substantive issues are important enough for immediate review.

20. As we noted above, Esso does not appeal from that part of the order imposing monetary sanctions on it.

33

rise to the sanctions (the substance of the Goldman Antonetti appeal). We therefore cannot conclusively and finally determine whether the sanctions imposed on Goldman Antonetti are too harsh without also determining whether those same sanctions adequately accounted for the harm caused to the other parties.

In exercising jurisdiction here, we are exercising jurisdiction over the appeals by the parties to whom Esso was directed to pay sanctions. Because Esso has not appealed this aspect of the district court's order, the reasons for our use of pendent appellate jurisdiction are slightly different from the reasons for our use of that doctrine to review the appeals of the parties to whom Goldman Antonetti was directed to pay sanctions. First, the harm, if any, caused by Goldman Antonetti's discovery violations affected all of the parties, though to a varying degree; that some of those parties were to be paid by Esso rather than Goldman Antonetti had nothing to do with whether Esso or Goldman Antonetti had harmed them. Put differently, the question whether Goldman Antonetti's discovery violations caused harm affects all the parties to whom sanctions were directed. Therefore, for the same reasons that Goldman Antonetti's appeal and the appeals of the parties to whom Goldman Antonetti was directed to pay sanctions are closely intertwined, so too are the appeals of the parties to whom Esso was directed to pay sanctions closely intertwined with Goldman Antonetti's appeal.

Second, we resolve these appeals, see infra part IV, section B, by reference to the same issue that governs the appeals of the parties to whom Goldman Antonetti was directed to pay sanctions, namely, the responsibility an aggrieved party has to specify for the court the harm caused by a discovery violation. Therefore, as with our review of the district court's use of inherent powers, see supra part III, section A, practical realities strongly suggest that we exercise jurisdiction over all the appeals here. Otherwise, as above, we would surely face the issue again, after final judgment, at which time our resolution of the appeals of the parties to whom Goldman Antonetti was directed to pay sanctions -- either because of collateral estoppel, the doctrine of the law of the case, or our own

34

precedent -- would govern the outcome as to the parties to whom Esso was directed to pay sanctions.

In sum, our resolution of these appeals resolves the remaining appeals. It makes little practical sense to dismiss some of these appeals for lack of jurisdiction, hence we shall not do so. See Spears, 859 F.2d at 288 ("In these circumstances, considerations of judicial economy, the litigant's interests, and practicality demand that we exercise jurisdiction over the [otherwise nonappealable] appeal."). As in part III, section A, the case for exercising pendent (party) appellate jurisdiction here is so compelling and the circumstances of this appeal so unusual that we do not extend the law by much in holding that pendent appellate jurisdiction applies here. We therefore will review that part of the district court's order imposing monetary sanctions directed to parties to the litigation.

B. Was the Monetary Sanction Appropriate? 21

1. Introduction and Standard of Review

Our review of the award of monetary sanctions must address dual concerns. First, we must examine the sanctions award from the standpoint of Goldman Antonetti, which contends that the district court erred in imposing sanctions at all. Second, the parties to whom the court awarded sanctions argue that the sanctions were inadequate to account for the full scope of the harm they suffered as a result of Esso's and Goldman Antonetti's discovery violations.

The standard governing the district court's award of sanctions is a legal question subject to plenary review. See PIRG, 51 F.3d at 1184; cf. Martin, 63 F.3d at 1262 (subjecting a claim that a sanction proceeding violated due process requirements to plenary review). If a district court applies the proper legal standard, then the award of

_____

21. The analysis that follows in the text does not make a distinction between inherent powers sanctions and statute-based or rule-based sanctions. In respects relevant to our discussion, the sanctioning tools are the same.

sanctions, including the extent of those sanctions, is within the discretion of the district court. See PIRG , 51 F.3d at 1184; see also Chambers, 501 U.S. at 55 ("We review a court's imposition of sanctions under its inherent powers for abuse of discretion."). "An abuse of discretion is a `clear error of judgment,' and not simply a different result which can arguably be obtained when applying the law to the facts of the case." United Telegraph Workers, AFL-CIO v. Western Union Corp., 771 F.2d 699, 703 (3d Cir. 1985) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). To determine whether a district court abused its discretion, "we evaluate the court's factual determinations, legal conclusions, and choice of an `appropriate sanction' with substantial deference, considering not whether we would make the same precise determinations, but only whether those determinations are contrary to reason or without a reasonable basis in law and fact." Simmerman, 27 F.3d at 62.

2. Did the District Court Abuse its Discretion in Sanctioning Goldman Antonetti?

Goldman Antonetti submits that the district court made a number of factual and legal errors serious enough to warrant our reversing its decision to impose sanctions. First, the firm argues that costs and expenses associated with the sanctions hearings themselves are not recoverable as sanctions. Next, it contends that the district court failed to identify the individual acts for which it is liable for sanctions. Even assuming that there were individual acts that might be sanctionable, Goldman Antonetti further contends that such acts caused the moving parties no prejudice. At all events, it concludes, the parties seeking sanctions had already released the firm from liability.

a. Can Sanctions be Based on the Costs of Sanctioning Proceedings?

Goldman Antonetti argues that the district court impermissibly awarded sanctions based on the costs and expenses arising from the sanctions proceedings themselves. In the firm's submission, such an award

constitutes improper fee shifting. We disagree. It is beyond dispute that attorney's fees are, in certain circumstances, properly awarded as a sanction. We are unaware of precedent in this circuit that categorically excludes from such an award attorney's fees arising from the sanctions proceedings themselves (though, as we discuss below, there is precedent in other circuits that bears on this issue).22 Nor do we believe such a categorical exclusion is wise. The time, effort, and resources expended in bringing sanctionable conduct to light would have been unnecessary had the sanctionable conduct never occurred. These costs are as much a harm to a party in the litigation as is the delay in the litigation or the substantive prejudice caused by the conduct. If we exclude from a possible award the costs of sanctions proceedings, we would undermine the compensatory goal of a sanctions award.

Further, if a party is aware ex ante that the costs he incurs in exposing sanctionable conduct will never be recouped, that party may decide to forgo a sanctions proceeding altogether. In doing so, however, that party might allow otherwise sanctionable conduct to go unaddressed. In such cases, the deterrent goal of a sanction award has been lost; parties who know that the likelihood of facing a sanction proceeding are low may engage in sanctionable conduct more often. Therefore, we believe a district court, in the exercise of its discretion, may award attorney's fees arising from sanctions proceedings.

We are aware of precedent in other circuits that has disallowed such awards in the Rule 11 context. See, e.g., Zimmerman v. Bishop Estate, 25 F.3d 784, 790 (9th Cir.

---

22. In Chambers, in which the Supreme Court affirmed in all respects the award of sanctions in the case, see Chambers, 501 U.S. at 55–58, the district court employed its inherent powers to award sanctions based in part on the costs associated with the sanctions proceedings themselves. See NASCO, Inc. v. Calcasieu Television & Radio, Inc., 124 F.R.D. 120, 143 (W.D. La. 1989), aff'd, 894 F.2d 696 (5th Cir. 1990), aff'd sub nom., Chambers v. NASCO, Inc., 501 U.S. 32 (1991). Although the Supreme Court did not directly address the precise issue we address here, and there is no indication that the parties raised it, the Court at least implicitly approved of a sanction award based on the costs associated with the sanctions proceedings themselves.

1994); <u>Pan-Pacific and Low Ball Cable Television Co. v. Pacific Union Co.</u>, 987 F.2d 594, 597 (9th Cir. 1993); <u>Lockary v. Kayfetz</u>, 974 F.2d 1166, 1177-78 (9th Cir. 1992); <u>Brubaker v. City of Richmond</u>, 943 F.2d 1363, 1387 (4th Cir. 1991); <u>Blue v. United States Dept. of the Army</u>, 914 F.2d 525, 548-49 (4th Cir. 1990).23 However, better reasoned precedent in still other circuits supports our view that the costs associated with the sanctions proceedings themselves can be recoverable. <u>See</u>, e.g., <u>Kirk Capital Corp. v. Bailey</u>, 16 F.3d 1485, 1491 (8th Cir. 1994); <u>Silva v. Witschen</u>, 19 F.3d 725, 733 n.15 (1st Cir. 1994); <u>Brandt v. Schal Assocs., Inc.</u>, 960 F.2d 640, 649-51 (7th Cir. 1992); <u>In re Stauffer Seeds, Inc.</u>, 817 F.2d 47, 50 (8th Cir. 1987) (Rule 37).

In addition, in 1993, Rule 11 was amended to add language that would allow sanctions for the costs associated with presenting or opposing a motion for Rule 11 sanctions. <u>See</u> Joseph, <u>supra</u>, § 16(B)(17), at 278. The

---

23. A number of these cases take guidance from <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384 (1990), in which the Supreme Court held that Rule 11 does not allow the recovery of the costs associated with defending a sanction award on appeal. <u>See id.</u> at 406-09. We believe that reliance on <u>Cooter & Gell</u> to hold that Rule 11 does not allow recovery of the costs associated with the sanctions proceedings themselves is misplaced. The Court in <u>Cooter & Gell</u> was moved by a number of context-based factors. First, the Court noted that Rule 11 does not apply to appeals, and that applying Rule 11 to appeals would upset the scheme, contained in the Federal Rules of Appellate Procedure, for sanctioning frivolous appeals. <u>See id.</u> at 406, 408. Allowing a Rule 11 award based on the sanctions proceedings themselves, would not, however, implicate the Rules of Appellate Procedure at all because such proceedings inhere in the district court. Further, borrowing from the proximate cause theories of tort law, the Court noted that costs on appeal were a result of the sanction itself and the appeal, not a result of the improper filing. <u>See id.</u> at 406-07. The costs of the sanctions proceedings, however, are more properly characterized as the result of the improper filing. Finally, the Court feared that allowing recovery of the costs of appeal would discourage sanctioned parties from pursuing meritorious appeals. <u>See id.</u> at 407. Allowing recovery of the costs associated with the sanctions proceedings has no effect on the pursuit of meritorious appeals and, as we note in the text, allowing such recovery might encourage parties to bring sanctionable conduct to light.

38

language in Rule 11 now states that "the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." Fed. R. Civ. P. 11(c)(1)(A). That amendment seems to have effectively overruled cases that held that it is an abuse of discretion to award sanctions based on the costs of sanctions proceedings.24

b. Actions Giving Rise to Sanctions Against Goldman Antonetti

Goldman Antonetti is correct in pointing out that the district court did not identify with specificity many of the acts that caused it to infer that Esso and Goldman Antonetti were engaged in a pattern of delay. The court did, however, make extensive findings as to the Agrelot memorandum and the anomaly investigation. With respect to both of those matters, the district court's findings were not unreasonable. The undisputed fact is that the Agrelot memorandum did not surface until well after discovery had begun and until well after parties to the litigation had made repeated requests that clearly covered the document.

Goldman Antonetti advances a plausible explanation for why the Agrelot memorandum was produced so late in the litigation. It is certainly possible that no attorney from Goldman Antonetti knew of the Agrelot memorandum until it was found in October 1993, notwithstanding testimony to the contrary; it is equally possible that the Agrelot memorandum was misfiled by both Soil Tech and by Goldman Antonetti. That is not to say, however, that the court's findings, which are based on an inference that Goldman Antonetti intentionally withheld the Agrelot memorandum, are unreasonable. There is evidence in the record that Goldman Antonetti attorneys knew of the memorandum's existence. Those same attorneys responded to the discovery requests covering such memorandum, and yet the document was not produced.

_____

24. We are aware of only one case decided after the 1993 amendment to Rule 11 that disallowed such an award; however, the opinion did not cite the amendment and uncritically applied prior circuit precedent. See Zimmerman, 25 F.3d at 790 (citing Lockary).

With respect to the anomaly investigation, our analysis is similar. Goldman Antonetti relies on a report by a magistrate judge concluding that the firm's actions during the investigation amounted to nothing more than zealous advocacy in representation of its clients and therefore did not warrant sanctions. The firm submits that the district court had no basis to disagree with the magistrate judge's conclusions. However, the district court in that instance did not owe the magistrate judge any deference. Further, the undisputed evidence makes it clear that it was not unreasonable for the district court to conclude that the delays in the investigation were willful and in bad faith. The investigation began late, was aborted prematurely because of the failure of the parties to arrive with appropriate equipment, and was not completed for many months.

Goldman Antonetti's next argument -- that the failure to produce the Agrelot memorandum caused no harm to the other parties in the litigation -- suffers the same fate. The firm here stresses that it produced the entire ETC report, of which the Agrelot memorandum was merely a summary. If, Goldman Antonetti questions, a full report has been produced, how can the failure to produce a summary of the report cause any harm to a party that can easily summarize the report for itself? The firm has a good point, but it does not mean that the district court's conclusion was contrary to reason. The ETC report was both complex and voluminous. Examining it required significant costs. A summary prepared by an expert would have reduced these costs and identified the problems that could only have been discovered by imposing a considerable burden on those examining the report for the first time. We concede, as did the district court, that the summary, timely produced, might have provided the parties to the litigation with less assistance than they claim. Still, it would have provided assistance, and that is the crux of the harm caused by the failure of Esso and Goldman Antonetti to produce the Agrelot memorandum.

c. Was Goldman Antonetti Released from Sanctions?

Goldman Antonetti also argues that three of the parties seeking sanctions from it -- Four Winds, Laga, and Western

Auto Supply -- have already released the firm from liability. Goldman Antonetti bases this argument on the settlement agreement reached between Esso and these parties in which the parties settled the underlying litigation and released Esso and "their . . . attorneys" from liability. Because Goldman Antonetti served as Esso's attorneys, it follows, Goldman Antonetti reasons, that the settlement agreement eliminates the possibility that these parties can collect a sanctions award from Goldman Antonetti. The district court disagreed. "Because the interpretation of contractual language to discern contractual intent is a question of fact, our review is limited to a determination whether the district court's findings are clearly erroneous." Painewebber Inc. v. Hartmann, 921 F.2d 507, 510 (3d Cir. 1990).

The issue, then, is whether the parties intended the term "attorneys" in the settlement agreement to refer only to counsel representing Esso at the time of the signing of the agreement, or also to refer to counsel who had represented Esso previously. The district court held that the release -- a contract -- does not cover Goldman Antonetti for two reasons. First, by the time the settlement agreement came into force, Esso had already severed its relationship with Goldman Antonetti. Because the term "attorneys" plainly refers only to counsel representing Esso at the time of the settlement agreement, the term must not encompass Goldman Antonetti. Second, even assuming that the examination of extrinsic evidence is appropriate here either to explain the term "attorneys" or to show that the parties attached some special meaning to "attorneys," there is no extrinsic evidence that the parties to the settlement intended it to cover Goldman Antonetti. Goldman Antonetti offers and our review of the record suggests nothing-- save the language of the settlement agreement, which does not, by its terms, cover Goldman Antonetti -- that would lead us to conclude that the district court's findings were clearly erroneous under any legal standard governing interpretation of a contractual term.

In sum, we are satisfied that the district court did not abuse its discretion in concluding that Goldman Antonetti is subject to some form of sanction and that $120,000 was an appropriate sanction.

41

3. The Process of Determining the Extent of Harm
Caused by Discovery Violations

The movants appeal the measure of the sanctions the
court awarded to them. They argue that the process the
court undertook to determine the extent of the harm
caused by the sanctionable conduct was in error, first
because the district court ruled that their submissions
detailing their harm were inadequate, and second because
the district court awarded a uniform level of sanction based
on the submission of one party. It would be useful, then, to
begin by briefly describing that process.

Having held that the discovery violations caused harm,
the court examined the papers these parties submitted that
purported to describe the extent of that harm. The court
believed that the papers "suffer[ed] from two shortcomings."
Tutu III, 166 F.R.D. at 342. First, the papers did not
adequately categorize the claimed harm within the
framework the court had created for addressing the
sanctionable conduct. The court found it difficult to
determine whether the moving parties were seeking costs
and expenses from (1) discovery violations related to the
search for evidence of contamination at ETSS; (2) the
failure to disclose the Agrelot memo; or (3) the sanctions
proceedings themselves, the three broad areas into which
the court held sanctionable conduct fell. Second, the court
faulted the parties for their general failure to provide it with
documentation "that adequately and efficiently explained to
the court how those expenses could be justified as a
sanction." Id.

These shortcomings led the court to award only a portion
of the sanctions sought. The court declined to scrutinize
the voluminous submissions of the parties in order to
perform the categorization it had requested the parties to
perform. Instead, the court simply denied the award of
sanctions arising from (1) discovery violations related to the
search for evidence of contamination at ETSS; and (2) the
failure to disclose the Agrelot memo. The court did,
however, award sanctions arising from the sanctions
proceedings themselves. The court set a uniform level of
sanction award based on L'Henri's request. The court did so

because it believed that L'Henri's request was clear, well supported, and, in all, "unassailable."

a. The Failure of the Submission

We believe that the district court was well within its discretion to deny the requested sanctions based upon the parties' submissions. Our independent review of the submissions generally confirms the district court's view that they are less than helpful. The submissions are voluminous, are not well organized, and, at bottom, are unclear. It would take an enormous effort to impress upon them the order necessary for a reasoned decision, including the making of a reasoned judgment as to the validity of the requests contained therein. Although we suspect that, had the district court chosen to undertake such an effort, the material submitted might ultimately have supported the award of additional sanctions, we do not believe that it was unreasonable or a clear error of judgment for the district court to refuse such a huge task.

Engaging the submissions on their own terms would cause great delays in a complex case already delayed by discovery violations and already taxing judicial resources. In short, the district court exercised its discretion in such a manner so as to prevent "a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (discussing a request for attorney's fees in civil rights litigation). We do not believe that by doing so the district court abused its discretion.

Instructive in this regard are cases addressing requests for attorney's fees under civil rights or other similar statutes that allow for fee shifting in certain circumstances. These cases make clear that the applicant for fees has an affirmative responsibility to assist the court in sorting through, organizing, and evaluating a fee request. The Supreme Court has stated that in such cases the "fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Id. In submitting an application, the applicant must exercise "billing judgment" by making a "good-faith effort to exclude from a fee request hours that

43

are excessive, redundant, or otherwise unnecessary." Id. at 434. As we stated in Hall v. Borough of Roselle, 747 F.2d 838 (3d Cir. 1984), "members of the bar are quasi-officers of the court and they are expected to be careful . .. in their representations to the court." Id. at 841-42. Busy district judges cannot be expected to do lawyers' work.

In sum, as with requests for attorney's fees, in assessing the harm discovery violations may have caused to litigants, district courts deserve the conscientious assistance of lawyers. Although a court is free to do so, it is not incumbent upon a district court to devote its own valuable time, energy, and resources to remedy the shortcomings of movants' submissions if that assistance falls short. Nor will we require the court to do so here. We thus do not believe the district court abused its discretion in refusing to award sanctions based on the submissions of the movants.

b. Basing the Sanctions on L'Henri's Request

We also believe that the district court was within its discretion to award each party a uniform level of sanction to compensate the parties for their participation in the sanctions proceedings, and to base that uniform level on the submission of L'Henri. The decision to impose a uniform level of sanction suggests that the court believed that the amount of effort appropriately expended in preparing for and participating in the sanctions proceedings was uniform across the various parties. Such a belief was not unreasonable here since the parties were similarly situated.

According to the court, L'Henri's counsel, Nancy D'Anna, submitted well-reasoned, thoroughly researched, and adequately documented material to the court throughout the sanctions proceedings. What is more, the court continued, L'Henri produced such material efficiently and relatively cheaply. In deciding to base the uniform level of sanction on L'Henri's request, the district court implicitly found that each party could have produced similarly well-reasoned, thorough, and adequately documented material for no greater cost than that incurred by L'Henri. We believe that it is not an abuse of discretion for the district

44

court to assume that all parties can produce work of
L'Henri's quality for approximately the same cost.

In sum, we believe the district court acted within its
discretion in awarding only a portion of the monetary
sanctions sought by the moving parties.

V. CLAIMS FOR CERCLA CONTRIBUTION

Unfortunately, we have no appellate jurisdiction over that
portion of the district court's order rejecting the motion to
dismiss Esso's claims for CERCLA contribution as a
sanction under Poulis v. State Farm Fire and Casualty Co.,
747 F.2d 863 (3d Cir. 1984). Poulis sets out a six-factor
balancing test to guide a court's analysis as to whether to
dismiss a claim as a sanction. See id. at 868. One of those
factors requires that we examine the "meritoriousness of the
claim or defense." Id. (emphasis in original). However, the
CERCLA claims have never been filed, though they
undoubtedly will be. The district court, in an effort to stem
the voluminous paper flow, has apparently asked counsel
to withhold moving forward on the CERCLA claims until a
more propitious point in the litigation. Therefore, under the
current posture of the case we would be hard pressed to
find some means to review contentions with respect to
these claims.

If this problem did not exist, the parties might argue that
we have jurisdiction over the Poulis claim under the
collateral order doctrine as set forth in Cohen.25 However,
the Cohen test would allow us to exercise jurisdiction only
if, inter alia, our review would not require us to examine
the merits of the underlying litigation that remains to be
adjudicated. To review the Poulis claim, we would need to
do just that because Poulis requires us to examine the
merits of the underlying CERCLA litigation.

Additionally, the Cohen test does not allow our exercise of
appellate jurisdiction over a non-final order if the order can
be appealed effectively after final judgment. Here, there can
be little dispute that the parties can appeal the Poulis claim
_____

25. As we explain supra section II, part A, the district court's order is not
final for appellate jurisdiction purposes.

after final judgment, by which time the claim will likely be better defined. We therefore have no jurisdiction over that part of the district court's order denying the motion to dismiss Esso's claim for contribution as a sanction, and will dismiss the appeals challenging that part of the order.

VI. CONCLUSION

The order of the district court will be affirmed insofar as it imposes a $120,000 sanction on Goldman Antonetti and insofar as it rejects the claims for additional sanctions against Esso and Goldman Antonetti, but will be reversed insofar as it orders the suspension of Cepeda, Romero, and Torres and insofar as it requires Esso and Goldman Antonetti to fund a Community Service Sanction Account. The appeals relating to the refusal of the district court to dismiss Esso's claims for contribution will be dismissed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit