NYGAARD, Circuit Judge, dissenting
 

 This appeal presents us with two issues: First, does a district court possess the inherent power to dismiss an indictment after serial hung juries, and second, did the District Court here abuse its discretion by dismissing this indictment after two of them. I answer yes to the first and no to the second. Because I view this to be a matter of substantial importance, I must respectfully dissent.
 
 [1]
 

 As the majority notes, twice now, the Government has tried Raymont Wright for a violation of federal law: being a felon in possession of a firearm.
 
 [2]
 
 Twice now, the Government has done so on the basis of essentially the same evidence at trials presided over by the same District Court. And twice now, two different juries could not reach a verdict. Thus, when the Government announced its intention to put Wright on trial for the third time, the District Court was skeptical. It asked for briefing on whether it possessed the inherent power to prohibit the Government from taking a third turn, and if it did, whether the court should use that power.
 
 [3]
 
 After hearing from both sides, the District Court concluded that its inherent power applied to this circumstance. It then exercised its discretion to dismiss the indictment.
 

 Neither the Government nor the majority disputes that district courts have the inherent authority to dismiss indictments under at least some circumstances. Citing to
 
 United States v. Hasting
 
 ,
 
 [4]
 
 however, the majority cabins that authority to those instances in which there is evidence of prosecutorial misconduct. In my view, in so doing, the majority conflates and confuses the various powers of the court. And it also hobbles the court's discretion to probe the impact on the fair administration of justice of those prosecutorial decisions that sit outside the definition of bad conduct but still pose-or threaten to pose-real institutional harm.
 

 The executive office inheres prosecutors with the power to bring a case to trial. The judicial office, on the other hand, inheres the court with the power to end a case.
 
 [5]
 
 Both offices share a responsibility to safeguard the overall integrity of the judicial process. But when a prosecutor decides to proceed with another trial in the aftermath of multiple mistrials, who but the court is empowered to question the impact of the prosecutor's discretion on the fair administration of justice, particularly when the court has concerns that the proceedings-and the institution-will be tainted by the abuse of jury shopping? It could be argued that two mistrials may not in some instances be enough to inflict serious institutional damage. But, the majority's combined reliance on
 
 Dietz v. Bouldin
 

 [6]
 
 and Fed. R. Crim. P. 31(b)(3) to allow the prosecutor to bring an unlimited number of retrials, so long as she or he does not stray into the realm of "illegal conduct," provides the prosecutor with an unchecked power. This
 poses a threat to the integrity of the judiciary and contradicts the inherent responsibility and authority vested in the judiciary by the framers of the Constitution. Thus, it is the majority's decision-and not the District Court's exercise of its inherent authority-that violates the separation of power principles on which the majority relies. We must affirm that our trial court judges have the discretion, originating in the court's inherent power, to take proper action when warranted to protect the institutional integrity of the judiciary.
 

 Here, the District Court mindfully struck the balance that is necessary anytime the power of the court and the power of the prosecutor intersect. Drawing from factors set out in
 
 State v. Abbati
 
 ,
 
 [7]
 
 the District Court identified and investigated a circumstance that it identified as harmful to the institution and to the defendant: jury shopping. It also took note of the impact of serial retrials on the defendant. It then properly dismissed the indictment. Its use of the court's inherent discretion did not violate the separation of powers doctrine. To the contrary, it gave definition and substance to it.
 

 I.
 

 Some review is appropriate to illuminate how and possibly why I believe the majority confuses the court's various powers.
 

 A.
 

 Federal courts operate within a constitutional system that enumerates the powers of each branch of government, as set forth in the founding document. Article I restrains congressional power to those "legislative Powers granted herein."
 
 [8]
 
 By comparison, Article II vests the President with "the executive Power" without further description, limitation, or restriction.
 
 [9]
 
 Analogous to Article II, Article III conveys without restriction or limitation the "judicial Power" to federal courts.
 
 [10]
 
 Accordingly, the Supreme Court has-since at least 1812-recognized that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution."
 
 [11]
 
 "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of" inherent authority.
 
 [12]
 

 Moreover, two bedrock purposes of the Constitution-checking the actions of the states and ensuring that Congress and the Executive do not overstep their boundaries-require a federal judiciary that exercises its own independent judicial power. That is, it would be impossible for federal courts to discharge these vital duties if they lacked some inherent power beyond the reach of the Executive or the legislature. I think of it this way: the elaborate measures set out in the Constitution to protect the independence of the judiciary (life tenure, removal from office only through impeachment, no decrease in salary during a judge's tenure, for example) would be meaningless if there were not some inherent, unimpeachable power vested solely in the federal courts.
 

 In
 
 Eash v. Riggins Trucking Inc
 
 .,
 
 [13]
 
 we defined inherent power as vesting in federal
 courts upon their creation and as not deriving from any statute. In this sense, the "judicial power" given to the federal courts by Article III of the Constitution is the "power to decide, in accordance with law, who should prevail in a case or controversy."
 
 [14]
 
 No matter the description, this power is intrinsic to the judicial office and cannot be inhibited by any rule or act of Congress. As we have recognized, the boundaries of this power are often "nebulous" and "shadowy,"
 
 [15]
 
 and "it is not always possible to categorize inherent power."
 
 [16]
 
 Yet, we have an outline.
 

 In
 
 Eash,
 
 we identified three main classes or categories of inherent power: 1) inherent powers based in Article III, that is, the power of a lower federal court to decide a case over which it has jurisdiction; 2) those powers "necessary to the exercise of all others,"
 
 [17]
 
 and 3) powers that include those reasonably useful to achieve justice, which are "necessary only in the practical sense of being useful."
 
 [18]
 
 Focusing on the first category, the inherent power to decide a case is "so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms 'court' and 'judicial power.' "
 
 [19]
 
 In other words, powers in this category make a court a court; they are encoded into the judiciary's DNA. Courts have referred to this power as a court's "irreducible inherent authority"
 
 [20]
 
 and "the core Article III power."
 
 [21]
 
 It is nothing less than our ability to decide a case over which we have jurisdiction, without interference by Congress or the Executive.
 
 [22]
 

 Drawing from this, when I refer to a district court's inherent power, I mean a " '[c]ertain implied power[ ] [that] must necessarily result to our Courts of justice from the nature of their institution,' [a] power[ ] 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.' "
 
 [23]
 
 It is "grounded in the separation of powers concept," since to deny it and yet maintain an independent judiciary "is a self-contradiction."
 

 [24]
 

 However, that is not to say that the court operates solely outside the realm of legislatively granted judicial powers.
 
 [25]
 
 In fact, the categorization scheme in
 
 Eash
 
 was intended largely as a means of explaining the relationship between inherent judicial powers and legislatively granted judicial powers.
 
 [26]
 
 It is here that I believe the majority's analysis strays.
 

 B.
 

 The majority, the briefs, and the discussion at oral argument reveal what has become a commonplace but imprecise conflation of the terms "inherent power" and "supervisory power."
 
 [27]
 
 The Government, while referencing the District Court's "inherent power," also referred to the court's "supervisory power," and its "inherent supervisory judicial authority."
 
 [28]
 
 The Appellee covers the entire panoply, citing the District Court's "supervisory authority," its "supervisory power," and its "inherent power."
 
 [29]
 
 At times, we too have been guilty of adding to the confusion.
 
 [30]
 
 The erroneous interchangeability of these terms clouds an important distinction that is crucial to this appeal: the difference between inherent judicial powers and legislatively granted judicial powers.
 
 [31]
 
 As noted
 
 supra
 
 , inherent "judicial power" is given to the federal courts by Article III of the Constitution.
 
 [32]
 
 Through this grant, federal courts receive the "power to decide, in accordance with law, who should prevail in a case or controversy."
 
 [33]
 
 The merging of the terms "inherent" and "supervisory" likely has its genesis in the fact that some inherent powers are supervisory in function, such as a federal court's inherent power "to supervise the administration of criminal justice."
 
 [34]
 

 However, unlike inherent powers, a court's supervisory authority may come from, and can be limited by, acts of Congress
 or a court's own rules.
 
 [35]
 
 Supervisory power often speaks to the power "to mandate 'procedures deemed desirable from the viewpoint of sound judicial practice.' "
 
 [36]
 
 A court's use of supervisory power can usually be classified in one of three ways. First, supervisory power can refer to an appellate court's supervision of a district court, through the imposition of procedures in addition to those already imposed by federal statute or constitutional provision.
 
 [37]
 
 We have, for example, relied on our supervisory power over district courts to review the application of local rules of practice and procedure.
 
 [38]
 
 We have also used our supervisory power to prohibit certain jury instructions in the district courts
 
 [39]
 
 and to review attorney-client fee arrangements.
 
 [40]
 
 Second, Courts-both trial and appellate-also refer to their "supervisory power" when meaning their power to supervise pending litigation.
 
 [41]
 
 They can, for example, seal and unseal records,
 
 [42]
 
 reassign a case to a different judge on remand,
 
 [43]
 
 or disqualify an attorney on ethical grounds.
 
 [44]
 
 Lastly, the power of a federal court to supervise law enforcement officials can also be what a court intends when it speaks of its "supervisory power."
 
 [45]
 
 These powers broadly ensure that pending cases are managed uniformly and efficiently.
 

 I concede that the boundary between supervisory authority that is inherent to the court and that which is granted by the legislature can, at times, be difficult to identify. However, these difficulties are irrelevant to this case because I conclude
 that the District Court here acted pursuant to its inherent power and not to any authority conferred by any statute or rule. The District Court's action was not undertaken in supervision of pending litigation-two trials were already concluded and a potential third trial had not yet begun. Nor was it exercised according to a rule of procedure or practice newly announced by an appellate tribunal. Moreover, its action was not a response to any prosecutorial misconduct or request from Wright to dismiss the indictment. There is simply no basis to conclude that the inherent power that the District Court exercised in this case derived from any legislative grant.
 

 To the contrary, the specific power under review here is the power to dismiss an indictment after two mistrials because of deadlocked juries in each instance. This power falls within
 
 Eash's
 
 first category of power because it is an inherent power to resolve a case. A court, by its nature, must be able to dismiss with prejudice actions brought before it, just as it must have the power to decide cases and enter judgments.
 
 [46]
 
 Such exercises of power are fundamental to the essence of a court. Were they not, the judicial system simply could not function.
 
 [47]
 

 The inherent power to dismiss is "of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law," and so is a power that is part of the very nature of the judicial institution.
 
 [48]
 
 It is incidental and necessary to the fair and efficient operation of the courts.
 
 [49]
 
 Indeed, "the power to dismiss exists in many situations. For example, a district court has the inherent power to dismiss sua sponte for lack of jurisdiction, or under the doctrine of forum non conveniens."
 
 [50]
 
 Because the power to resolve a case by dismissing an indictment (in a criminal action) or a complaint (in a civil action) is fundamental to the essence of a court of justice, it cannot be interfered with. Indeed, as two commentators have explained, "
 
 McNabb
 
 , other Supreme Court cases, and an analysis of several lower court opinions addressing this precise issue should sufficiently dispel any notion that the federal courts lack the power to bar repeated attempts to obtain a conviction" following serial mistrials.
 
 [51]
 
 Thus, the District Court's action here was well within the boundaries of its inherent power.
 

 Therefore, the majority's conclusion that "inherent authority," "supervisory power," and "supervisory authority" all refer to the same thing (while understandable given the rampant muddled references that persist) ultimately misses the point. The power at issue here is the inherent power of the court to decide a case: a power that is limited by the boundaries of reason and
 discretion and is subject to appellate review for abuse. It is not subject to the power of Congress or the Executive.
 

 II.
 

 There is no dispute that district courts have the inherent power to dismiss indictments in at least some circumstance. The majority nevertheless concludes that the District Court lacked the power to do so in this case. The majority reaches that conclusion for three principal reasons, but none withstands scrutiny.
 

 A.
 

 First, the majority agrees with the Government's argument that the District Court's dismissal violated the Separation of Powers Doctrine. I agree that the District Court's dismissal implicates the separation of powers. But its actions were in furtherance-not in violation-of the doctrine. The separation of powers doctrine refers to the balance among the branches of Government which prevents one branch from disrupting the constitutional functions of another.
 
 [52]
 

 Here, the majority concludes that, in dismissing the indictment after two hung juries, the District Court encroached on the independence of the Executive because it prohibited the prosecution from exercising its constitutional duty to enforce the laws of the United States. Certainly, the United States Attorney, as a member of the Executive Branch, has such a responsibility.
 
 [53]
 
 And, just as certainly, the decision to prosecute "is soundly within the discretion of the prosecutor, not the courts."
 
 [54]
 
 The Government's authority not to prosecute a case is clear as well.
 
 [55]
 
 But we see no sign that the District Court did anything to prevent the Government from fulfilling its duty. To the contrary, the Government was twice given a full and fair opportunity to present its case and makes no claim that the District Court ever prevented it from doing so. Having had those opportunities, the Government had no absolute right as a matter of separation of powers or otherwise to try again. As two commentators have explained, a district court's use of its inherent power to dismiss an indictment after serial mistrials does not raise "significant separation of powers concerns" because the nature of that inherent power means that federal courts "need not automatically defer to a prosecutor's decision to retry a defendant" in this situation.
 
 [56]
 

 The majority nevertheless concludes that prosecutors have the unimpeded right to try persons for violating federal law based on an indictment as many times as they wish and that the separation of powers doctrine prohibits a federal court from interfering. This position is untenable because it is not a true reflection of the separation of powers. It is axiomatic that no one branch of government is completely divorced from the other two. In reality, "our constitutional system imposes on the Branches a degree of overlapping responsibility,
 a duty of interdependence as well as independence."
 
 [57]
 
 This overlap becomes problematic, of course, when it results in an encroachment (when an action of one branch might undermine the independence of another branch) or an aggrandizement (where one branch seeks "powers more appropriately diffused among separate Branches").
 
 [58]
 

 But recognizing a district court's right to prohibit a retrial following serial mistrials does not implicate these concerns. To the contrary, and putting the shoe on the other foot, the Government's position that nothing limits its opportunity to try and retry a defendant as many times as it chooses violates the judicial branch's constitutional mandate to exercise its judicial power. Just as the filing of an indictment is an exercise of executive power, the dismissal of one is an exercise of judicial power. The unlimited serial prosecutions that the Government advocates for, and that the majority permits, would limit a court's authority to dismiss an indictment to only those instances in which the prosecutor steps outside the bounds of professional conduct. But our independence as an institution of government must include an ability to adjudicate, and thus dismiss with prejudice, individual cases when a district court, in its discretion, has concerns about the impact of serial retrials on the institution and the defendant. We view the prosecution of a defendant after deadlocked juries as a tipping point in balancing the separation of powers. As the repeated prosecutions increase, so too does the judiciary's power to limit them. As we stated in
 
 Eash
 
 , and as we said
 
 supra
 
 , a court's exercise of its inherent power to dismiss an indictment after retrials does not violate the separation of powers but is grounded in it.
 
 [59]
 

 B.
 

 Second, and relatedly, the majority concludes that the District Court's dismissal was in violation of Fed. R. Crim. P. 31(b)(3), which the majority claims confers on prosecutors the unlimited discretion to retry defendants following serial mistrials. Rule 31 does nothing of the kind. Rule 31 provides in relevant part that "if a jury cannot agree on a verdict on one or more counts, the court may declare a mistrial on those counts. The government may retry any defendant on any counts on which the jury could not agree."
 
 [60]
 
 The Supreme Court adopted this rule in its original form in 1944 as a "restatement of existing law."
 
 [61]
 
 The Supreme Court itself appears never to have cited Rule 31(b)(3), and neither the few Courts of Appeals to have done so
 
 [62]
 
 nor its Advisory Committee Notes have discussed its history or purpose in any detail. Arguably, the rule's reference to the prosecutor's general ability to retry a defendant following a mistrial may be nothing more than a recognition of the longstanding principle that retrials following mistrials are not prohibited by the Double Jeopardy Clause,
 
 [63]
 
 which is not at issue here.
 

 In any event, this rule does not by its terms prohibit district courts from dismissing indictments following serial mistrials. District courts have the inherent power to do so as explained above. A district court's exercise of that power could be contrary to Rule 31(b)(3) only if the rule contained an "express grant of or limitation on" that power.
 
 [64]
 
 It does not. The rule does not mandate a retrial after a mistrial. Nor does it contain any other limitation on the district court's power to prohibit one. In fact, the rule does not even mention that issue.
 
 [65]
 
 Thus, as the Supreme Court has noted in addressing other rules of court, "[i]t would require a much clearer expression of purpose than [this rule] provides for us to assume that it was intended to abrogate" the district courts' inherent power.
 
 [66]
 
 Put simply, when there have been multiple mistrials and the prosecutor seeks to try the case again, Rule 31(b)(3) does not purport to reduce the role of the district courts to that of a rubber stamp.
 

 C.
 

 Finally, the majority claims that a district court can exercise its inherent power to dismiss an indictment only if there is evidence of willful bad faith or prosecutorial misconduct on the part of the government and resultant prejudice to the defendant. It cites to numerous decisions that it says supports this position.
 
 [67]
 
 But none of these cases deals with the particular circumstance we face here: the decision to retry a defendant after serial mistrials.
 
 [68]
 
 In fact, many are dismissals due to prosecutorial misconduct. The majority's reliance on such decisions is misplaced because it ignores the fact that the dismissal in this case was not punitive in nature; it was not a sanction for misconduct.
 
 [69]
 
 As two commentators have explained, "[a]lthough the inherent power principle has usually involved cases of misconduct by the parties or a vindication of statutory principles, the doctrine is not so limited."
 
 [70]
 
 To the contrary, courts may use their inherent authority to dismiss indictments whenever necessary to vindicate "principles of fairness to the defendant and the interests of the public in the effective administration of justice."
 
 [71]
 

 That is just what the District Court did here. The Government asked the District
 Court to dismiss
 
 without
 
 prejudice "[e]ven if this court were inclined to dismiss the case."
 
 [72]
 
 Yet the Government proffered no additional evidence it would present if Wright was re-indicted. It asked to try the same case again before a third jury, merely hoping for a different result. The District Court's dismissal of the indictment with prejudice was based on the merits, or lack thereof, of the Government's request, no more and no less.
 

 Moreover, the dismissal was not, as the majority contends, a general declaration of unfairness simply because the government failed to obtain a conviction.
 
 [73]
 
 Nor was it merely an attempt to shield the defendant from the anxiety of a retrial.
 
 [74]
 
 Reference to
 
 Miller
 
 and
 
 Shepherd
 
 misconstrues not only the circumstance of this case, but also the gravity of the District Court's concern. As I discuss next, the District Court weighed many factors, mindful of the importance of each, before making its decision. From all of this-even taking into account the separation of powers and Rule 31(b)(3) -it is evident to me that the District Court correctly concluded it had the inherent authority to act upon the prosecutor's decision to retry this case in the wake of two mistrials.
 
 [75]
 

 III.
 

 Before moving to the actual merits of the District Court's decision, a word of caution is in order. Just because a court has inherent power to dismiss an indictment after a retrial does not mean it should always be exercised.
 
 [76]
 
 My dissenting opinion today should not be interpreted as an endorsement of unchecked and ungrounded judicial power. Nor should it be interpreted as permitting district courts in this Circuit to dismiss indictments without a significant basis for doing so. Moreover, nothing in this opinion should be read as limiting reprosecution to two trials. Cases no doubt exist where a third or fourth trial on the same indictment may be appropriate where the evidence so indicates. It is simply my conclusion that, in some cases, and in the proper exercise of its discretion, a district court has the inherent power to prohibit continued re-prosecution by dismissing an indictment.
 

 IV.
 

 This is such a case. The District Court here rightly proceeded with the Government's request for another trial with deliberate caution. Recognizing the lack of guidance from this Court, the District Court turned to a decision of the Supreme Court of New Jersey. In
 
 State v. Abbati
 
 ,
 
 [77]
 
 that court listed several factors a trial court should consider before dismissing an indictment after several hung juries. These factors are valid inquiries and include
 

 • the number of previous mistrials and the outcome of the juries' deliberations, as far as can be determined;
 

 • the character or nature of the previous trials, considering their length, complexity of issues, and similarities in evidence;
 

 • the probability that any subsequent trial will be much different from the previous ones;
 

 • the relative strength of the party's case, as determined by the trial court;
 

 • the conduct of counsel during the previous trials.
 
 [78]
 

 In considering these factors, a district court must also accord appropriate weight to the Government's decision to continue prosecution, giving deliberate consideration to the reasons for that choice.
 
 [79]
 

 Other considerations might include the seriousness of the crimes charged, the public's interest in the effective resolution of criminal charges, and the criminal defendant's circumstances, including the impact that continued prosecution might have on him or her and the potential for unfairness or unnecessary hardship.
 
 [80]
 
 The factors just outlined are not an exhaustive list and district courts could consider other things that are reasonably useful in answering whether further prosecutions after deadlocked juries should be permitted. Moreover, all of these elements of inquiry enable the court to assess the impact that a serial retrial has on the integrity of the judiciary as an institution.
 

 These avenues of inquiry make sense to me. Take differences in evidence, for example. If the evidence would be different at a retrial, then there seems little chance that continued prosecution should be curtailed. If, on the other hand, there would be no substantial difference in evidence, concern about re-prosecution is appropriate. So too the number of deadlocked juries is an important consideration. Continued prosecution after two, three, or even four deadlocked juries could unbalance the scale. By inquiring into the seriousness of the charges, a district court could compare the crime being prosecuted to other cases when a court dismissed an indictment after deadlocked juries. In other words, a district court must make sufficient findings and establish a sufficient record supporting its decision, thus enabling a court of appeals to accurately assess whether the district court abused its discretion or not. That is what the District Court did here.
 

 I see no abuse of discretion in the District Court's exercise of its inherent powers. The District Court's ruling was not arbitrary and instead was based on a thorough, careful, and balanced consideration of the above factors. The District Court first acknowledged the weight of its actions within our constitutional scheme. It then found that the evidence suggested that the deadlock was not the result of a lone holdout. As to the character of the preceding trials, the District Court noted the Government's position that this was a "simple" case. It also stated that both previous trials were "virtual duplicates" and that counsel on both sides was the same for both prosecutions. The District Court further observed the lack of any allegation of jury nullification or bias. Instead, it found that "there is every indication that
 the two juries engaged in deliberations in good faith, and, despite their best efforts, were unable to reach a verdict."
 

 The District Court also considered the strength of the parties' respective cases and determined that its opinion on this factor was irrelevant, given that two separate juries had concluded that the Government failed to meet its burden of proof. It commended the professionalism and hence the effectiveness of counsel on all sides, which it weighted as favoring disallowing any further prosecution. The District Court specifically considered the seriousness of the crime charged, and it noted that other courts had dismissed indictments when the charges were far graver.
 
 [81]
 
 Lastly, the District Court thoroughly balanced the Government's authority to prosecute against the effect of continued prosecution on Wright. Recognizing that Wright has been on bond since July of 2014, and on home detention for nearly two years, the District Court concluded that this inquiry tipped in his favor.
 

 V.
 

 In conclusion, I see no abuse of discretion in the District Court's careful and thorough balancing of relevant factors, a balancing which led it to invoke its inherent power and to dismiss the Government's indictment of Wright. For all of these reasons, I respectfully dissent from my esteemed colleagues in the majority. I would affirm.
 

 McKEE, Circuit Judge, concurring in the judgment.
 

 As I shall explain, I am sympathetic to what the District Court was trying to do in this case and I think I understand why the court acted as it did. Moreover, I agree with Judge Nygaard insofar as he posits in dissent that a District Court can step in at some point and bar a retrial without infringing on the separation of powers. Nevertheless, despite my belief that the separation of powers doctrine is not necessarily violated by a trial court barring a retrial after successive mistrials, and despite my belief that the District Court was trying to act in a manner that would assure a measure of justice for Wright, I concur in the judgment reversing the District Court. I simply do not believe that the current state of the law supports the District Court's action in the absence of prosecutorial misconduct, bad faith, or more than two unsuccessful trials. Since the record is clear that the District Court found neither prosecutorial misconduct nor bad faith, I concur in the judgment reversing the court's order but feel compelled to write separately to explain why.
 

 I.
 

 At the outset, it is important to note that I do not believe that a trial court lacks the power to, at some point, call a halt to successive prosecutions following deadlocked juries, and I do not read Judge Shwartz's opinion as standing for that principle. The Government even conceded at oral argument that there could come a point where successive prosecutions become so onerous and burdensome that additional trials rise to the level of a Due Process violation which a trial court is clearly empowered to prevent. Moreover, in
 
 Barkus v. Illinois
 
 ,
 
 [1]
 
 the Supreme Court noted that there "may" come a point
 where multiple prosecutions become so harassing that they violate the Due Process Clause.
 
 [2]
 

 Here the evidence in both trials consisted solely of police testimony. According to the officers' testimony, some residents of the community witnessed crucial parts of Wright's encounter with the police, but they did not testify. Similarly, Wright did not testify on his own behalf, nor did the defense put on a case. His theory was that he had no way of knowing that the men in plain clothes and unmarked cars who began pursuing him were police; he panicked, sped away, and crashed; and police subsequently planted the gun at the scene. Wright also asserted that the officers chose not to test the gun for DNA or fingerprints because they knew the results would contradict their story. In an effort to counter Wright's argument from the first trial that police decided not to test the gun for fingerprints and DNA in order to hide their malfeasance, the Government called experts at the second trial "who testified about the difficulty of retrieving DNA and fingerprint evidence from firearms."
 
 [3]
 

 Nevertheless, the Government's case depended entirely on the testimony of police officers who had worked together for many years and/or knew one another. Over the span of ten months, the District Court twice listened to the police testimony during the trials. That testimony was at times contradictory and at other times strained credulity.
 

 At the first trial, Detective Fallert, who first noticed Wright speeding, testified that Wright was travelling at 90 mph, but he did not note that in his police paperwork nor did he note it at the pretrial hearing. His contemporaneously prepared investigative report also did not claim that Wright was initially speeding. Detective Henson, who took over the chase, testified that he saw Wright holding a handgun, but conceded that he had no way of knowing whether Wright knew he was a police officer when the pursuit began. Lastly, Detective Baker testified similarly to Henson, yet guessed that Wright had been going at a speed of 60 mph and accelerated. This is a very substantial discrepancy, especially for seasoned police officers who can be expected to have some expertise and experience in estimating the speed of an automobile.
 

 In the second trial, the Government called the same witnesses, with the exception of Detective Fallert. Notably, this time Detective Henson testified he actually did not see Wright speeding. Two different juries found themselves deadlocked-unable to convict or acquit.
 

 II.
 

 The majority opinion suggests that the District Court's decision to dismiss the indictment with prejudice impermissibly infringed upon the jury's role. Judge Shwartz states: "[t]he District Court nonetheless applied its own predictions about what another jury may do when presented with the same evidence," and concluded that was "an improper exercise of a court's supervisory power."
 
 [4]
 
 However, it is difficult to know whether the District Court ruled as it did based upon a belief that a third jury presented with the same evidence would be unable to reach a verdict or whether it simply shared the doubts that some of the jurors obviously had about the veracity of police officers' testimony.
 

 In any event, either scenario poses exactly the same issue about a court overstepping its bounds and infringing on the role of a jury as well as prosecutorial discretion. As I stated at the beginning, to the extent that a trial judge can intervene and dismiss an indictment, I am skeptical that this record supports such an assertion of judicial authority. Nevertheless, there is more support for the judge's actions here than our reversal suggests.
 

 It is not a novel proposition that a trial judge must "ensure that any and all ... evidence is not only relevant, but also reliable."
 
 [5]
 
 "The trial judge's role is to preside over the trial; passively if possible but aggressively when indicated."
 
 [6]
 
 Thus, the law allows for trial courts to channel the jury's judgment in certain circumstances. Here, the court's decision would prevent another jury from hearing the same evidence that has failed to convict Wright on two prior occasions.
 

 There are situations in which judges must act as "gatekeepers" and ensure the reliability of evidence before a jury is able to consider it. Accordingly, in an admittedly very different context, the Supreme Court has described trial judges as gatekeepers of evidence.
 
 [7]
 
 "[A] gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations."
 
 [8]
 

 Despite the importance of the jury system, and the faith we place in juries, the law has thus traditionally recognized the danger that jurors may not be able to restrict their deliberations to admissible evidence and that they may return a verdict based on factors other than the evidence presented at trial. For example, Federal Rule of Evidence 403 allows courts to prevent jurors from learning of certain testimony (even uncontradicted testimony) if the court concludes that the testimony could cause a jury to reach a verdict based more on emotion or prejudice than on evidence.
 
 [9]
 

 The best known example of how courts are empowered to limit what a jury can consider may well be the body of law that has developed in the wake of the Supreme Court's decision in
 
 Daubert.
 
 In
 
 Daubert
 
 , the Court stated: "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."
 
 [10]
 
 We certainly could, but do not, allow the jury to determine whether the scientific evidence is reliable in the first instance based upon testimony at trial. Instead, that preliminary factual determination rests solely with the trial court if the reliability is challenged.
 

 The difficulty with relying on this body of law here is, of course, the fact that the trial court's dismissal of Wright's indictment was not limited to an intrusion into the jury-box. More fundamentally, and more importantly, it also trespassed on the separation of powers, and concomitantly,
 on the prosecutorial discretion that is endemic in that concept.
 

 Despite Judge Nygaard's thoughtful attempt to address that issue and the jury's obvious concerns regarding the testimony of police officers in this case, I am not convinced that the United States Supreme Court would agree that the inherent powers of a trial court are broad enough to justify what happened here.
 

 The Government clearly has the inherent authority to decide not to retry Wright given all of the circumstances in this case, including the seemingly improbable account of what happened,
 
 [11]
 
 the conflicting nature of the police testimony and the jurors' apparent trouble with it, the fact that there is no additional evidence to offer at a third trial, and Wright's apparent steps toward rehabilitation since the offense which disqualified him from lawfully owning a firearm, as well as any other factors that the Government might appropriately consider.
 
 [12]
 
 However, I can find no authority that convinces me that the United States Supreme Court would agree that a trial court's inherent authority allows it to dismiss an indictment with prejudice on this record.
 

 III.
 

 As I noted at the outset, the Government agrees that successive prosecutions
 
 can
 
 rise to the level of a Due Process violation, which a court clearly could remedy by dismissing an indictment. However, the Government strenuously argues Wright's prosecution has not yet reached that point. The Government's position inherently argues that the court's action here is also not justified by any concept of fundamental fairness. In
 
 Ake v. Oklahoma
 
 ,
 
 [13]
 
 the Supreme Court observed that the right to Due Process includes the "guarantee of fundamental fairness."
 
 [14]
 
 As has been discussed by Judge Shwartz, the District Court here relied on the decision of the New Jersey Supreme Court in
 
 State v. Abbati
 
 .
 
 [15]
 
 There, the New Jersey Supreme Court affirmed a trial court's dismissal of an indictment with prejudice after two juries deadlocked, resulting in mistrials.
 
 [16]
 
 That situation is on "all fours" with the circumstances here and the District Court relied heavily on that decision to justify its action and fashion a rule that would properly allow a trial court to dismiss an indictment with prejudice under certain circumstances.
 
 [17]
 

 However, the New Jersey Supreme Court based its decision on the inherent
 authority of state courts under the New Jersey Constitution.
 
 [18]
 
 It did not purport to rest its decision on the U.S. Constitution and, with very limited exception, it cited to state judicial decisions-not federal ones-in discussing when consecutive hung juries justified dismissing an indictment with prejudice.
 
 [19]
 
 The holding of the Court is summarized in its statement that the "judicial responsibility for the proper administration of criminal justice also gives rise to the inherent power to dismiss an indictment in appropriate circumstances."
 
 [20]
 

 The
 
 Abbati
 
 standard has not been discussed by this Court (aside from in the instant case), let alone adopted by it. Although some of the factors used by the New Jersey Supreme Court are analogous to considerations federal courts have made in similar federal cases, such as
 
 United States v. Ingram
 

 [21]
 
 and
 
 United States v. Rossoff
 
 ,
 
 [22]
 

 Abbati
 
 has no real corollary in federal case law.
 
 [23]
 

 Accordingly, as I noted at the outset, I am sympathetic to the District Court's efforts given the totality of the circumstances here. However, until Congress or the United States Supreme Court determines otherwise, I agree that we have no alternative but to enter judgment reversing the District Court. I therefore concur in the judgment reversing the District Court's order.
 

 Whether the District Court had the inherent power to dismiss the indictment is a legal question. We employ a plenary standard of review to that issue.
 
 See
 

 United States v. Schiff
 
 ,
 
 602 F.3d 152
 
 , 161 (3d Cir. 2010) (citing
 
 United States v. Scott
 
 ,
 
 223 F.3d 208
 
 , 210 (3d Cir. 2000) ). Whether the District Court appropriately exercised this power is reviewed for an abuse of discretion.
 
 Link v. Wabash R.R. Co.
 
 ,
 
 370 U.S. 626
 
 , 633,
 
 82 S.Ct. 1386
 
 ,
 
 8 L.Ed.2d 734
 
 (1962).
 

 See
 

 18 U.S.C. § 922
 
 (g).
 

 The District Court ordered the parties to "file cross briefs stating their position regarding whether the Court, through an exercise of its inherent authority, should prohibit or permit a second re-trial in this case."
 
 United States v. Wright
 
 , No. 14-cr-292,
 
 2017 WL 1179006
 
 , at *1 (W.D. Pa. 2017).
 

 461 U.S. 499
 
 , 505,
 
 103 S.Ct. 1974
 
 ,
 
 76 L.Ed.2d 96
 
 (1983).
 

 See
 

 Young v. U.S. ex rel. Vuitton et Fils S.A
 
 .,
 
 481 U.S. 787
 
 , 816,
 
 107 S.Ct. 2124
 
 ,
 
 95 L.Ed.2d 740
 
 (1987) (Scalia, J. concurring)("The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy.
 
 See
 
 Art. III, § 2.... [S]ince the prosecution of law violators is part of the implementation of the laws, it is-at least to the extent that it is publicly exercised-executive power, vested by the Constitution in the President.") (footnote omitted).
 

 --- U.S. ----,
 
 136 S.Ct. 1885
 
 , 1892,
 
 195 L.Ed.2d 161
 
 (2016).
 

 99 N.J. 418
 
 ,
 
 493 A.2d 513
 
 , 521-22 (1985).
 

 U.S. Const. art. I, § 1.
 

 U.S. Const. art. II, § 1.
 

 U.S. Const. art. III, § 1.
 

 United States v. Hudson
 
 , 11 U.S. (7 Cranch) 32, 34,
 
 3 L.Ed. 259
 
 (1812).
 

 Ex parte Robinson
 
 ,
 
 86 U.S. 19
 
 Wall. 505, 510,
 
 22 L.Ed. 205
 
 (1873) (speaking of the inherent contempt power).
 

 757 F.2d 557
 
 , 561 (3d Cir. 1985) (en banc).
 

 Young
 
 ,
 
 481 U.S. at 816
 
 ,
 
 107 S.Ct. 2124
 
 (Scalia, J., concurring).
 

 Eash
 
 ,
 
 757 F.2d at 561
 
 (citation omitted).
 

 Id
 
 . at 562.
 

 Id
 
 . (quoting
 
 Roadway Express, Inc., v. Piper
 
 ,
 
 447 U.S. 752
 
 , 764,
 
 100 S.Ct. 2455
 
 ,
 
 65 L.Ed.2d 488
 
 (1980) ).
 

 Id.
 

 at 563 ;
 
 see also
 

 Am. Civil Liberties Union v. Holder
 
 ,
 
 673 F.3d 245
 
 , 255-56 (4th Cir. 2011) (applying
 
 Eash
 
 factors);
 
 In re Stone
 
 ,
 
 986 F.2d 898
 
 , 901-02 (5th Cir. 1993) (per curiam) (adopting
 
 Eash
 
 factors). In
 
 Chambers v. NASCO Inc.,
 
 the Supreme Court was urged to adopt our approach to inherent powers. But the Court held that it "ha[d] never so classified the inherent powers and ... ha[d] no need to do so now."
 
 501 U.S. 32
 
 , 47 n.12,
 
 111 S.Ct. 2123
 
 ,
 
 115 L.Ed.2d 27
 
 (1991).
 

 Eash
 
 ,
 
 757 F.2d at 562
 
 . The third aspect of a court's inherent power is its authority to employ persons or instruments not connected with the court, such as experts and auditors, to assist in its decision-making function. This facet of inherent power is not in play here.
 

 Id
 
 .
 

 Am. Civil Liberties Union v. Holder
 
 ,
 
 673 F.3d at 256
 
 .
 

 United States v. Klein
 
 , 80 U.S. (13 Wall.) 128, 147,
 
 20 L.Ed. 519
 
 (1871),
 
 Eash
 
 ,
 
 757 F.2d at 562
 
 (noting that courts may exercise this type of inherent power despite legislation to the contrary);
 
 see also
 

 Michaelson v. United States ex rel. Chicago, St. P., M. & O. Ry. Co.
 
 ,
 
 266 U.S. 42
 
 , 64,
 
 45 S.Ct. 18
 
 ,
 
 69 L.Ed. 162
 
 (1924) (acknowledging that the Constitution vests courts with some powers unalterable by legislation).
 

 Chambers
 
 ,
 
 501 U.S. at 43
 
 ,
 
 111 S.Ct. 2123
 
 (quoting
 
 Hudson
 
 , 11 U.S. (7 Cranch) at 34.).
 

 Eash,
 

 757 F.2d at 562
 
 .
 

 See
 

 Hudson
 
 , 11 U.S. (7 Cranch) at 33.
 

 See
 

 In re Tutu Wells Contamination Litig
 
 .,
 
 120 F.3d 368
 
 , 384 n.14 (3d Cir. 1997),
 
 overruled on other grounds by
 

 Cunningham v. Hamilton County, Ohio
 
 ,
 
 527 U.S. 198
 
 ,
 
 119 S.Ct. 1915
 
 ,
 
 144 L.Ed.2d 184
 
 (1999).
 

 In
 
 Eash
 
 , we noted that "[t]he conceptual and definitional problems regarding inherent power ... have bedeviled commentators for years,"
 
 757 F.2d at 561
 
 , and that "those cases that have employed inherent power appear to use that generic term to describe several distinguishable court powers,"
 

 id.
 

 at 562
 
 . We also noted that "this lack of specificity [has been compounded by courts] rel[ying] ... on precedents involving one form of power to support the court's use of another."
 
 Id
 
 .
 

 E.g.,
 
 Appellant's Br. at 13, 16; Appellant's Reply Br. at 2, 14.
 

 E.g
 
 ., Appellee's Br. at 22, 26.
 

 See, e.g.,
 

 United States v. Accetturo
 
 ,
 
 783 F.2d 382
 
 , 396 (3d Cir. 1986) (Sloviter, J., dissenting) (speaking of our "inherent supervisory power");
 
 see also
 

 United States v. Watkins
 
 ,
 
 339 F.3d 167
 
 , 180 (3d Cir. 2003) (Nygaard, J., concurring) (referring to both a court's supervisory power and inherent power to dismiss a case under Fed. R. Crim. P. 48(b) ).
 

 In re Tutu Wells Litig
 
 .,
 
 120 F.3d at
 
 384 n. 14.
 

 See
 
 U.S. Const. art. III, § 1.
 

 Young
 
 ,
 
 481 U.S. at 816
 
 ,
 
 107 S.Ct. 2124
 
 (Scalia, J., concurring).
 

 United States v. Payner
 
 ,
 
 447 U.S. 727
 
 , 735 n.7,
 
 100 S.Ct. 2439
 
 ,
 
 65 L.Ed.2d 468
 
 (1980) (quotation marks omitted);
 
 see also
 
 Sara Sun Beale,
 
 Reconsidering Supervisory Power in Criminal Cases; Constitutional and Statutory Limits of the Federal Courts
 
 ,
 
 84 Colum. L. Rev. 1433
 
 , 1433-34, 1465, 1470 (1984) (identification of Article III "judicial power," not congressional acts, as the source of the Supreme Court's supervisory authority).
 

 See, e.g.,
 

 McNabb v. United States
 
 ,
 
 318 U.S. 332
 
 , 340-41,
 
 63 S.Ct. 608
 
 ,
 
 87 L.Ed. 819
 
 (1943) ;
 
 Hasting
 
 ,
 
 461 U.S. at 505
 
 ,
 
 103 S.Ct. 1974
 
 .
 

 United States v. Moreno
 
 ,
 
 809 F.3d 766
 
 , 780 (3d Cir. 2016) (quoting
 
 Thomas v. Arn
 
 ,
 
 474 U.S. 140
 
 , 146-47,
 
 106 S.Ct. 466
 
 ,
 
 88 L.Ed.2d 435
 
 (1985) ).
 

 See, e.g.,
 

 Castro v. United States
 
 ,
 
 540 U.S. 375
 
 , 384,
 
 124 S.Ct. 786
 
 ,
 
 157 L.Ed.2d 778
 
 (2003) (instructing district courts to notify pro se litigants about consequences of re-characterizing motions as ones seeking relief under
 
 28 U.S.C. § 2255
 
 );
 
 Thiel v. S. Pac. Co
 
 .,
 
 328 U.S. 217
 
 , 225,
 
 66 S.Ct. 984
 
 ,
 
 90 L.Ed. 1181
 
 (1946) (announcing a new rule for the composition of federal juries);
 
 Dunbar v. Triangle Lumber & Supply Co
 
 .,
 
 816 F.2d 126
 
 , 129 (3d Cir. 1987) (prescribing procedures for motions to dismiss based on the conduct of a litigant's counsel);
 
 United States v. Bazzano
 
 ,
 
 570 F.2d 1120
 
 , 1137-38 (3d Cir. 1977) (requiring district courts to state reasons for a criminal sentence).
 

 See
 

 United States v. Wecht
 
 ,
 
 484 F.3d 194
 
 , 204-05 (3d Cir. 2007).
 

 See
 

 United States v. E. Med. Billing Inc.
 
 ,
 
 230 F.3d 600
 
 , 607-12 (3d Cir. 2000).
 

 See
 

 Ryan v. Butera, Beausang, Cohen & Brennan
 
 ,
 
 193 F.3d 210
 
 , 214 (3d Cir. 1999).
 

 See, e.g.,
 

 Carlisle v. United States
 
 ,
 
 517 U.S. 416
 
 , 425-26,
 
 116 S.Ct. 1460
 
 ,
 
 134 L.Ed.2d 613
 
 (1996) (acknowledging "supervisory power" of district courts over litigation before them).
 

 See, e.g.,
 

 Hagestad v. Tragesser
 
 ,
 
 49 F.3d 1430
 
 , 1434 (9th Cir. 1995).
 

 See
 

 Gov't of the Virgin Islands v. Walker
 
 ,
 
 261 F.3d 370
 
 , 376 (3d Cir. 2001) (noting that, "[a]lthough it is the standard practice in the district courts and in this circuit that a case on remand is assigned to the judge who originally heard it, we can, in the exercise of our supervisory power, reassign this case to a different judge upon remand.") (quotation marks omitted).
 

 In re Grand Jury Investigation
 
 ,
 
 447 F.Supp.2d 453
 
 , 456-57 (E.D. Pa. 2006) (collecting cases);
 
 see also
 

 United States v. Moreno
 
 ,
 
 809 F.3d at 780
 
 (summarizing supervisory authority).
 

 See, e.g.,
 

 United States v. Thompson
 
 ,
 
 772 F.3d 752
 
 , 763 (3d Cir. 2014). For a comprehensive discussion of the origins and uses of supervisory power, see Amy Coney Barrett,
 
 The Supervisory Power of the Supreme Court
 
 ,
 
 106 Colum. L. Rev. 324
 
 , 330 (2006).
 

 We have also noted that our power to remand is a subset of the inherent power to dismiss a case.
 
 See
 

 Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc
 
 .,
 
 999 F.2d 745
 
 , 750 n.4 (3d Cir. 1993).
 

 See, e.g.,
 

 Fitzgerald v. First E. Seventh St. Tenants Corp.
 
 ,
 
 221 F.3d 362
 
 , 363-364 (2d Cir. 2000) (holding a district court has the inherent power to dismiss a case, sua sponte, if it determines that the action is frivolous or the court lacks jurisdiction over the matter).
 

 Link
 
 ,
 
 370 U.S. at 630
 
 ,
 
 82 S.Ct. 1386
 
 .
 

 See, e.g.,
 

 Bowers v. Nat'l Collegiate Athletic Ass'n
 
 ,
 
 564 F.Supp.2d 322
 
 , 333 (D.N.J. 2008) (citing
 
 Derzack v. County of Allegheny
 
 ,
 
 173 F.R.D. 400
 
 , 411 (W.D. Pa. 1996),
 
 aff'd without op
 
 .,
 
 118 F.3d 1575
 
 (3d Cir. 1997) ).
 

 In re Prevot
 
 ,
 
 59 F.3d 556
 
 , 565-66 (6th Cir. 1995).
 

 Michael A. Berch & Rebecca White Berch,
 
 The Power of the Judiciary to Dismiss Criminal Charges After Several Hung Juries: A Proposed Rule to Control Judicial Discretion
 
 ,
 
 30 Loy. L.A. L. Rev. 535
 
 , 543 & nn. 42-43 (1997) (collecting cases).
 

 See, e.g.,
 

 Clinton v. Jones
 
 ,
 
 520 U.S. 681
 
 , 699-700,
 
 117 S.Ct. 1636
 
 ,
 
 137 L.Ed.2d 945
 
 (1997) ;
 
 Morrison v. Olson
 
 ,
 
 487 U.S. 654
 
 , 696,
 
 108 S.Ct. 2597
 
 ,
 
 101 L.Ed.2d 569
 
 (1988) ;
 
 Nixon v. Adm'r of Gen. Servs
 
 .,
 
 433 U.S. 425
 
 , 442-43,
 
 97 S.Ct. 2777
 
 ,
 
 53 L.Ed.2d 867
 
 (1977) ;
 
 Baraka v. McGreevey
 
 ,
 
 481 F.3d 187
 
 , 201 (3d Cir. 2007).
 

 See, e.g.,
 

 In re Grand Jury
 
 ,
 
 286 F.3d 153
 
 , 163 (3d Cir. 2002).
 

 United States v. Talley
 
 ,
 
 164 F.3d 989
 
 , 997 (6th Cir. 1999).
 

 See, e.g.,
 

 United States v. Quinn,
 

 728 F.3d 243
 
 , 255-56 (3d Cir. 2013).
 

 Berch & Berch,
 
 supra
 
 note 51, at 544.
 

 Mistretta v. United States
 
 ,
 
 488 U.S. 361
 
 , 381,
 
 109 S.Ct. 647
 
 ,
 
 102 L.Ed.2d 714
 
 (1989).
 

 Id
 
 . at 381,
 
 109 S.Ct. 647
 
 ;
 
 see also
 

 In re Tribune Media Co.,
 

 799 F.3d 272
 
 , 285 (3d Cir. 2015) (Ambro, J., concurring).
 

 See
 

 Eash
 
 ,
 
 757 F.2d at 562
 
 .
 

 Fed. R. Crim. P. 31(b)(3).
 

 Id
 
 . advisory committee's note to 1944 adoption.
 

 See
 

 United States v. Melendez
 
 ,
 
 775 F.3d 50
 
 , 57 (1st Cir. 2014) ;
 
 United States v. Warren
 
 ,
 
 593 F.3d 540
 
 , 546 (7th Cir. 2010) ;
 
 United States v. Fort
 
 ,
 
 472 F.3d 1106
 
 , 1111 n.3 (9th Cir. 2007) ;
 
 United States v. Gotti
 
 ,
 
 451 F.3d 133
 
 , 137 (2d Cir. 2006).
 

 See
 

 United States v. Perez
 
 ,
 
 22 U.S. 9
 
 Wheat. 579, 580,
 
 6 L.Ed. 165
 
 (1824).
 

 Dietz
 
 ,
 
 136 S.Ct. at 1892
 
 .
 

 The majority claims that Rule 31(b)(3) 's silence on this issue supports the proposition that district courts lack the authority to dismiss an indictment following serial mistrials. But because district courts have the inherent power to do so as explained above, the question is not whether Rule 31(b)(3)
 
 permits
 
 district courts to dismiss an indictment in that circumstance. The question instead is whether Rule 31(b)(3)
 
 prohibits
 
 them from doing so. It does not.
 

 Link
 
 ,
 
 370 U.S. at 631-32
 
 ,
 
 82 S.Ct. 1386
 
 .
 

 See
 

 Bank of Nova Scotia v. United States
 
 ,
 
 487 U.S. 250
 
 , 254-56, 263,
 
 108 S.Ct. 2369
 
 ,
 
 101 L.Ed.2d 228
 
 (1988) ;
 
 United States v. Chapman,
 

 524 F.3d 1073
 
 , 1087 (9th Cir. 2008) ;
 
 United States v. Goodson
 
 ,
 
 204 F.3d 508
 
 , 514 (4th Cir. 2000) ;
 
 United States v. Derrick
 
 ,
 
 163 F.3d 799
 
 , 808 (4th Cir. 1998) ;
 
 United States v. Tucker
 
 ,
 
 8 F.3d 673
 
 , 674 (9th Cir. 1993) (en banc);
 
 United States v. Van Engel
 
 ,
 
 15 F.3d 623
 
 , 631-32 (7th Cir. 1993) ;
 
 United States v. Santana
 
 ,
 
 6 F.3d 1
 
 , 11 (1st Cir. 1993) ;
 
 United States v. Isgro
 
 ,
 
 974 F.2d 1091
 
 , 1094 (9th Cir. 1992).
 

 Derrick
 
 does deal with a dismissal of the indictment after an initial grant of a retrial, but the circumstance differs from this case because the mistrials were not due to deadlocked verdicts.
 
 See
 

 163 F.3d at 803
 

 Cf., e.g.
 
 ,
 
 Isgro
 
 ,
 
 974 F.2d at 1097
 
 .
 

 Berch & Berch,
 
 supra
 
 note 51, at 548.
 

 Id.
 

 Wright
 
 ,
 
 2017 WL 1179006
 
 , at *7.
 

 See
 

 United States v. Miller
 
 ,
 
 4 F.3d 792
 
 , 795 (9th Cir. 1993).
 

 See
 

 United States v. Shepherd
 
 ,
 
 511 F.2d 119
 
 , 123 (5th Cir. 1975) ;
 
 see also
 

 Arizona v. Washington
 
 ,
 
 434 U.S. 497
 
 , 503-04,
 
 98 S.Ct. 824
 
 ,
 
 54 L.Ed.2d 717
 
 (1978).
 

 Although we conclude that the District Court appropriately exercised its inherent power as a court of law to dismiss an indictment, thus placing its actions within
 
 Eash's
 
 first category, the District Court appeared at one point to tether its dismissal to its "inherent authority to effectuate ... the speedy and orderly administration of justice and to ensure fundamental fairness."
 
 Wright
 
 ,
 
 2017 WL 1179006
 
 , at *2. These actions are typically associated with the second classification of
 
 Eash's
 
 powers.
 
 See
 

 Eash
 
 ,
 
 757 F.2d at 562-563
 
 . Nonetheless, it invoked the inherent power of the court and dismissed the case and it is on this basis that I conclude the District Court did not reach the boundaries of its power.
 

 See
 

 Lopez v. United States
 

 373 U.S. 427
 
 , 440,
 
 83 S.Ct. 1381
 
 ,
 
 10 L.Ed.2d 462
 
 (1963) ;
 
 see also
 

 Chambers
 
 ,
 
 501 U.S. at 44
 
 ,
 
 111 S.Ct. 2123
 
 ("Because of their very potency and discretion, inherent powers must be exercised with restraint and discretion.").
 

 493 A.2d 513
 
 .
 

 Id
 
 . at 521-22.
 

 See
 
 id.
 

 See
 

 id
 
 .
 

 Wright
 
 ,
 
 2017 WL 1179006
 
 , at *6 (citing
 
 United States v. Ingram
 
 ,
 
 412 F.Supp. 384
 
 , 385 (D.D.C. 1976) ;
 
 State v. Moriwake
 
 ,
 
 65 Haw. 47
 
 ,
 
 647 P.2d 705
 
 , 708 (1982) ;
 
 Abbati
 
 ,
 
 493 A.2d at
 
 517 ; and
 
 State v. Witt
 
 ,
 
 572 S.W.2d 913
 
 , 914 (Tenn. 1978) ).
 

 359 U.S. 121
 
 ,
 
 79 S.Ct. 676
 
 ,
 
 3 L.Ed.2d 684
 
 (1959).
 

 Id.
 

 at 127
 
 ,
 
 79 S.Ct. 676
 
 .
 

 Appellant Br. at 11.
 

 Maj. Op. 371-72.
 

 Kannankeril v. Terminix Int'l, Inc.
 
 ,
 
 128 F.3d 802
 
 , 806 (3d Cir. 1997) (citing
 
 Daubert v. Merrell Dow Pharms.
 
 ,
 
 509 U.S. 579
 
 , 589,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed.2d 469
 
 (1993) ).
 

 Holbrook v. Lykes Bros. Steamship Co.
 
 ,
 
 80 F.3d 777
 
 , 788 (3d Cir. 1996).
 

 Daubert
 
 ,
 
 509 U.S. at 597
 
 ,
 
 113 S.Ct. 2786
 
 .
 

 Id.
 

 See, e.g.
 
 ,
 
 United States v. Bailey
 
 ,
 
 840 F.3d 99
 
 , 117, 121-23, (3d Cir. 2016) (finding that the probative value of video evidence of murder committed by coconspirators was substantially outweighed by risk of unfair prejudice).
 

 Daubert
 
 ,
 
 509 U.S. at 589
 
 ,
 
 113 S.Ct. 2786
 
 .
 

 According to the officers' accounts, they watched (in the open and without cover) as Wright fumbled in the back of a car with tinted windows and came out holding a gun. They then continued to stand and watch from approximately 25 yards away-without cover and without taking any actions to protect themselves-as he attempted to rack the slide which would have placed a bullet in the chamber.
 

 Appellee argues without contradiction that:
 

 [f]ollowing early involvement with the criminal justice system, Mr. Wright began to turn his life around, returning to school and earning his Associates degree in Computer Management-Networking Engineering Technology[,] ... a Bachelor of Science degree in Information Technology and Management ... graduating
 
 cum laude
 
 [,] ... and ... a Master of Science degree.
 

 Appellee Br. at 52.
 

 470 U.S. 68
 
 ,
 
 105 S.Ct. 1087
 
 ,
 
 84 L.Ed.2d 53
 
 (1985).
 

 Id
 
 . at 76,
 
 105 S.Ct. 1087
 
 .
 

 99 N.J. 418
 
 ,
 
 493 A.2d 513
 
 (1985).
 

 Id.
 

 at 522
 
 .
 

 See
 

 United States v. Wright
 
 , Crim A No. 14-292,
 
 2017 WL 1179006
 
 , at *3, *4 (W.D. Pa. Mar. 30, 2017).
 

 Abbati
 
 ,
 
 493 A.2d at 517-18
 
 .
 

 Abbati
 
 cited to
 
 Ake
 
 , for the general proposition that the "requirement of fundamental fairness [is] grounded in [the] fourteenth amendment's due process guarantee."
 
 493 A.2d at 518
 
 . However, with the exception of a single District Court case, the Court cited numerous state court cases for the proposition that a trial court had the inherent authority to dismiss an indictment with prejudice after two juries deadlocked.
 

 Id.
 

 at 519-20
 
 . It concluded by finding "[t]hese examples of the courts' exercise of their power to administer the criminal justice system assist in answering the further argument of the State that recognition of an inherent judicial power to dismiss an indictment with prejudice would overstep the separation of powers."
 

 Id.
 

 at 520
 
 .
 
 Abbati
 
 dismissed that argument based upon its belief that "[t]he separation of powers is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital."
 

 Id.
 

 at 521 (citing
 
 State v. Leonardis
 
 ,
 
 73 N.J. 360
 
 ,
 
 375 A.2d 607
 
 , 612 (1977) ).
 

 Id
 
 . at 520.
 

 412 F.Supp. 384
 
 (D.D.C. 1976). The District Court of the District of Columbia dismissed an indictment after two trials in which twenty-one of twenty-four jurors voted to acquit. The court found no prosecutorial misconduct.
 

 Id.
 

 at 386
 
 . It instead considered the issue a "matter of fair play," emphasizing that "[t]he Government has no new proof; it simply wants another chance" and "simply wishes to keep pressing so long as juries disagree in the hope that a conviction eventually will result."
 

 Id.
 

 at 385
 
 .
 

 806 F.Supp. 200
 
 (C.D. Ill. 1992).
 

 For example, the first prong of
 
 Abbati
 
 's analysis concerns the number of mistrials and the outcome of the juries' deliberations.
 
 493 A.2d at 521
 
 . Both
 
 Rossoff
 
 and
 
 Ingram
 
 took this into account in dismissing indictments.
 
 See
 

 Rossoff
 
 ,
 
 806 F.Supp. at 203
 
 (naming, as "additional compelling circumstances: 1) the majority of jurors in both cases found Dr. Rossoff Not Guilty; 2) if not for the allegedly biased juror in the second trial, Dr. Rossoff would have been acquitted on all counts; 3) the two trials have taken over one solid month of the Court's time");
 
 Ingram
 
 ,
 
 412 F.Supp. at 385
 
 ("The proof was legally sufficient to support a conviction in each instance but the juries simply did not credit the witnesses, voting 10-2 and 11-1 for acquittal.").
 

 The
 
 Abbati
 
 standard is also based on the likelihood of any substantial difference in a subsequent trial, which the
 
 Ingram
 
 decision also considered.
 
 See
 

 Ingram
 
 ,
 
 412 F.Supp. at 385
 
 ("If another trial takes place there is every reason to believe the jury will again be divided or will acquit.").
 

 Finally,
 
 Rossoff
 
 and
 
 Ingram
 
 both made determinations similar to
 
 Abbati
 
 's seventh prong, the status of the individual and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness.
 
 99 N.J. at 422
 
 ,
 
 493 A.2d at
 
 515 ;
 
 see
 

 Ingram
 
 ,
 
 412 F.Supp. at 385-86
 
 ("Here is a man in jail now more than seven months primarily because of an offense which the Government is unable to convince a jury he committed. ... To permit a retrial, after 21 of 24 jurors have already refused to convict, is to ignore the reasonable doubt standard.");
 
 Rossoff
 
 ,
 
 806 F.Supp. at 203
 
 ("Dr. Rossoff is 71 years of age and in poor health. He has had heart surgery, suffers from severe anemia and at the time of the second trial was on experimental treatment. He has been under great physical and emotional strain as the result of these repeated trials and was even hospitalized immediately following the second trial.").